**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**TEXAS EDUCATION AGENCY et al.**
**(Austin Independent School District), Defendants-Appellees.**

**No. 71-2508.**

United States Court of Appeals,
Fifth Circuit.

Aug. 2, 1972.

For order denying motion to clarify mandate see 470 F.2d 1001.

Joseph D. Rich, Atty., David L. Norman, Asst. Atty. Gen., Brian K. Landsberg, John D. Leshy, Attys., U. S. Dept. of Justice, Washington, D. C., Seagal Wheatley, U. S. Atty., San Antonio, Tex., Bruce Davis, Atty., Civil Rights Div., U. S. Dept. of Justice, Washington, D. C., for the United States.

Sylvia Drew, New York City, Mario G. Obledo, John E. Serna, San Antonio, Tex., for intervenors Dedra Estell Overton and others.

James McCoy, Asst. Atty. Gen. of Tex., Austin, Tex., for Tex. Ed. Agency.

J. M. Patterson, Jr., Donald S. Thomas, Austin, Tex., for Austin Indept. School Dist.

Albert W. Alschuler, Mark Z. Levbarg, F. Patrick Hubbard, American Civil Liberties Union, Austin, Tex., amicus curiae.

Before JOHN R. BROWN, Chief Judge, and WISDOM, GEWIN, BELL, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM and RONEY, Circuit Judges.*

WISDOM, Circuit Judge, with whom JOHN R. BROWN, Chief Judge, and GEWIN, GOLDBERG, DYER, and SIMPSON, Circuit Judges, join:

Before 1954, the year *Brown I*[1] was decided, and for some years thereafter the Austin Independent School District (AISD) segregated black and white school children. The law of the land, since *Brown I* and *II,* requires the conversion of a dual system into a unitary system. Every judge on this Court understands that there is no school district where this conversion has been simple. We realize too that this conversion of a dual system to a unitary system is very difficult in metropolitan areas where there is not only an accelerated population growth, as in Austin, but there is also a movement of whites to the suburbs or to the periphery of the city. The involved process of attaining a unitary system is exceptionally difficult in Austin and in some other cities in the southwest where, in addition to other obstacles, Mexican-Americans in many cities in Texas are an identifiable ethnic minority. They are as much entitled to the benefits of the Equal Protection Clause of the Fourteenth Amendment as blacks or whites. Cisneros v. Corpus Christi Independent School District, No. 71–2397, 5 Cir., 459 F.2d 13; Alvarado v. El Paso Independent School District, 5 Cir. 1971, 445 F.2d 1011 [71–1555, June 16, 1971]. The district judge in the instant case recognized this fact and so stated in his memorandum opinion. Unfortunately, a fatal defect in the decree is that it fails to give effect to the legal consequences of the Court's recognition of Mexican-Americans as a separate minority group. (This is not to minimize the ineffectiveness of the decree in giving relief to blacks.) See generally, Fiss, The Charlotte-Mecklenburg Case—Its significance for Northern School Desegregation, 38 U. of Chi.L.

---

* Judge Thornberry did not participate in the en banc decision in this case.

1. Brown v. Bd. of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873

[Brown I]; Brown v. Bd. of Education, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 [Brown II].

Rev. 697 (1971); Rangel and Alcalo, De Jure Segregation of Chicanos in Texas Schools, 7 Harv. Civil Rights and Liberties Rev., 370 (1972).

"The reconciliation of competing values in a desegregation case is, of course, a difficult task with many sensitive facets but fundamentally no more so than remedial measures courts of equity have traditionally employed." Swann v. Charlotte-Mecklenburg Board of Education.[2] The school board is "charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green v. New Kent County School Board, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716.

## I.

### Procedural History

On August 7, 1970, the United States, under authority of the Civil Rights Act of 1964,[3] filed suit against the Texas Education Agency and the Austin Independent School District (AISD).[4] The original complaint charged that the AISD (1) "has traditionally operated and continues to operate a dual school system based on race" (i. e. segregated schools for blacks and whites) and, moreover, (2) is "discriminating against Mexican-American students", by assigning them to schools "that are identifiable as Mexican-American schools and schools that are attended almost exclusively by Mexican-American and Negro students". The Government asked the district court to "enjoin the defendants . . . from discriminating against black and Mexican-American children . . . on the basis of race and ethnic origin and require them to take affirmative action to disestablish that dual system of schools based on race and ethnic origin and to correct the effects of past discrimination based on race and ethnic origin". On the same day, the district court ordered the AISD, with the assistance of the Texas Education Agency and the Department of Health, Education, and Welfare (HEW) to develop and submit a desegregation plan. If the parties could reach no agreement, the order required them to submit their respective plans to the Court.[5]

A hearing was held on August 27, 1970, at which the Government presented an interim desegregation plan prepared by HEW, and the defendants presented an alternative plan. After the hearing, the district court orally ordered the HEW interim plan put into effect immediately. On September 4, 1970, the court entered a written order to the same effect that also contained standards similar to those in the decree formulated in Singleton v. Jackson Municipal Separate School District, 5 Cir. 1969, 419 F.2d 1211. These standards include provisions relating to faculty and staff, selection of schools, transportation of stu-

2. Swann v. Charlotte-Mecklenburg Bd. of Education, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554.

3. Section 407(a) and (b), 42 U.S.C. § 2000c-6(a) and (b).

4. The original suit named as defendants seven independent school districts in the Western District of Texas: Austin, Calvert, Ector, Hearne, La Vega, Midland, Temple. The present appeal concerns only Austin.

5. Several interested individuals and groups have sought to intervene since the filing of the original suit. A group of whites sought to intervene to oppose certain aspects of the desegregation plans; a group of blacks sought to intervene to oppose closing of black schools and bussing of black children; the Austin Anti-Bussing League sought to intervene and filed its "Desegregation Plan". The district court denied all motions for intervention. After the district court, on August 24, 1970, denied a motion to intervene filed on behalf of a group of Mexican-American students, the applicants filed a separate suit against AISD. On June 10, 1971, the district court denied a motion by those plaintiffs for consolidation and joint hearing of that suit with the present case. This Court, on August 25, 1971, granted a motion for intervention filed by a group of black and Mexican-American parents. The intervenors alleged that the Government no longer adequately represented their interests in this lawsuit.

dents, majority-to-minority transfers, and attendance outside the system. The court ordered HEW to make a comprehensive study of the AISD and to prepare a plan for the complete desegregation of all schools. The Court required AISD to cooperate with HEW, the plan to be submitted by December 15, 1970. If the parties failed to agree, they were to submit their respective plans to the Court on December 15, 1970. The district court granted four extensions of the deadline for the filing of plans. Finally, on May 14, 1971, each of the parties submitted a plan.

The trial on the merits lasted from June 14, 1971, to June 21, 1971. On June 28, 1971, the Court issued a "Memorandum Opinion and Order". The Court recognized that "Mexican Americans constitute a separate ethnic group", but held that the Government "failed in maintaining its burden of proof" that there had been *de jure* discrimination against Mexican-Americans.[6] As to black students, the Court held, "the Government has made no showing that in the period from 1955 to the present the AISD has intentionally perpetuated segregation of blacks; the record instead indicated that during this period the school administration's official acts have not been motivated by any discriminatory purpose[7]

. . . but . . . vestiges of a dual system continue to exist with respect to blacks".

The Court gave the parties until July 16, 1971, to review and revise their plans in light of its ruling. The Court also offered "guidelines" for use of the parties in formulating plans. First, the Court encouraged the parties to agree on a mutually acceptable plan, stating, "It will be far more desirable for all concerned to have the parties combine the best elements of their separate plans than to have the Court draw its own plan". Second, "the Court [encouraged] the parties to combine the best elements of both their plans with a view toward minimizing bussing". Third, the parties were told to "avoid plans which include Anderson [a 98 percent black high school] as a junior or senior high school". Finally, the Court declared that, although it had found no *de jure* segregation of Mexican-Americans, it "will nevertheless consider the effect upon this ethnic minority of any plan submitted by the parties".

On July 15, 1971, the parties filed a "Report and Submission". The parties agreed in light of the Court's "Guidelines" to the plan previously submitted by the defendants for the desegregation of the high schools. There was dis-

---

6. The Court found that:
 (a) The Austin Independent School District has never adopted, published or promulgated any written or unwritten rules, regulation or policies having as their purpose the discrimination against, or segregation or isolation of, Mexican Americans.
 (b) The Austin Independent School District has never discriminated against, or attempted to discriminate against, isolate or segregate Mexican-Americans in any form whatsoever, particularly in:
 (1) site location of schools;
 (2) school construction;
 (3) drawing of school attendance zones;
 (4) student assignments;
 (5) faculty assignments;
 (6) staff assignments;
 (7) faculty and staff employment;

(8) extracurricular activities; and
 (9) transportation.
 (c) The Zavala and West Elementary Schools were not built for the purpose of discriminating against, isolating or segregating students on the basis of Mexican American ethnic origin.

7. That finding was made in spite of the fact that after 1955 the defendants opened four schools not only with all black student body, but also with all black faculties assigned to them. One of those schools, the St. John School was built in an area which on all four sides was almost entirely white, Anglo. When the new St. John School opened in 1958, the Board drew its zone line for the school. It was a square. The zone line of the adjoining school was in the form of a closed fist with a thumb sticking up next to the St. John zone. That thumb was an Anglo residential area.

agreement as to the proper method for desegregating the junior high schools and the elementary schools. On July 19, 1971, the district court issued another "Memorandum Opinion and Order" rejecting the recommendations of HEW and adopting, with minor modifications, the AISD plan.

The Government appealed. The parties, intervenors (see footnote 5), and amicus curiae submitted briefs. A panel of this Court heard oral argument. This Court, on its own motion, determined to consider the case en banc. The en banc Court has had the benefit of the transcript of the oral argument, the original briefs, and supplemental briefs.

## II.

### The Austin School System

█ The Austin Independent School District encompasses the City of Austin and certain outlying areas of Travis County, Texas. The district is 30 miles long from north to south and 25 miles wide from east to west. During the 1970–71 school year, the school system had a total of 74 schools—8 high schools, 11 junior high schools, and 55 elementary schools. A total of 54,974 children attend public school—14,684 in high school, 10,779 in junior high school, and 29,511 in elementary school. Of these, 35,496 or 65 percent are white; 11,194 or 20 percent are Mexican-American and 8,284 or 15 percent are black. Of the 2,768 teachers and professionals employed by the school system, 2,267 or 82 percent are white; 418 or 15 percent are black; and 83 or not quite 3 percent are Mexican-American. (Because of the importance of the facts, especially the ethnic composition of the schools, to which we must often refer, we attach to this opinion Appendix A containing a complete breakdown of the ethnic composition of the students and professional staff in each school in the AISD for the 1970–71 year.)

Most of the blacks and Mexican-Americans are concentrated in East Austin.

East Austin is bordered on the west by an interstate highway and the downtown area of the city, on the north by Nineteenth Street and the airport, on the east by the school district line, and on the south by the Colorado River. The black population is concentrated in the northern section of East Austin, and the Mexican-American population in the southern section. Approximately 86 percent of the city's blacks and 64 percent of the city's Mexican-Americans live in East Austin. A comparison of the maps filed as exhibits shows that the school zoning is closely related to the demographic patterns; i. e., black school zones coincide with black residential areas; Mexican-American school zones coincide with Mexican-American residential areas. The correspondence of racial residential areas to school zones is too close to be a coincidence. The presence of old schools and the location of new ones, if combined with neighborhood zoning would, in the language of *Swann,* "further lock the school system into a mold of separation of the races".

There are eighteen schools in East Austin with greater than 90 percent minority enrollment; that is, blacks and Mexican-Americans. Of these schools, eight are over 95 percent black, four are over 95 percent Mexican-American, and six are over 90 percent black and Mexican-American. Seventy-seven percent of the city's black students and 59 percent of the Mexican-American students attend these schools. *See* Appendix A.

Outside of East Austin the population is primarily white and schools are attended predominately by whites. There are, however, three schools with greater than seventy percent minority enrollment. A small black community in the north-central part of the city is served by St. Johns Elementary School which is 94 percent black. South of the Colorado River and west of the interstate highway is a Mexican-American community served by Becker Elementary School which is 68 percent Mexican-American and 7 percent black. Maple-

wood Elementary School has a 70 percent minority enrollment and serves a small minority community north of East Austin.

## III.

### The District Court Order

A. *Secondary Schools*—AISD has traditionally assigned students to schools on the basis of attendance zones. The district court approved, with minor modifications, the AISD plan for desegregation of the secondary schools. On the senior high school level,[8] all-black Anderson High School will be closed, and all of the Anderson students will be reassigned to other high school zones. A portion of the Johnston zone will be switched to Austin High School zone, and other minor zone changes will be made. As a result, approximately 1200 black high school students (928 at Anderson and 287 at Johnston) will be attending schools outside of East Austin where the percentages of blacks will range from a low of 6.8 percent at Travis to a high of 19.7 percent at Johnston.[9]

8. During the 1970–71 school year, there were 2100 black high school students, 14 percent of the total high school population in the AISD. Of these 916 (43 percent) attended Anderson, and 619 (29 percent) attended Johnston. Anderson was all-black; Johnston was 32 percent black, 62 percent Mexican-American, and 6 percent white.

9.
AISD Plan Approved by Court
CLOSING ANDERSON- KEALING and
REDISTRICTING DISTRICTS FOLLOWING
1973 PLAN in 1971 *with* LIMITED TRANSPORTATION

| High Schools | Total Projected | Number of Negroes | Percentage Negro |
|---|---|---|---|
| Austin | 1185 | 189 | 15.9 |
| Crockett | 2794 | 278 | 10.0 |
| Johnston | 1686 | 332 | 19.7 |
| Lanier | 2854 | 287 | 10.1 |
| McCallum | 2451 | 361 | 14.7 |
| Reagan | 3065 | 554 | 18.0 |
| Travis | 1477 | 100 | 6.8 |

| Junior High | Total Projected | Number of Negroes | Percentage Negro |
|---|---|---|---|
| Allan | 773 | 195 | 25.2 |
| Burnett | 1252 | 116 | 9.3 |
| Fulmore | 1086 | 62 | 5.9 |
| Lamar | 1008 | 161 | 14.9 |
| Martin | 852 | 127 | 14.9 |
| Murchison | 947 | 100 | 10.6 |
| O'Henry | 770 | 39 | 5.1 |
| Pearce | 1254 | 163 | 13.0 |
| Porter | 1419 | 131 | 9.2 |
| Webb | 1052 | 160 | 15.2 |

Defendants Exhibit No. 37

The closing of Anderson and Kealing with the students being assigned to other school zones will require bussing. On the high school level, 23 busses will be needed; the total cost per year including operational costs will be $279,855. On the junior high school level, 17 busses will be needed; the total cost per year will be $207,895. The shift in student attendance will also require some adjustments in building capacity. On the high school level, 14 portables must be purchased and 10 moved, for a cost of $174,900; on the junior high school level, 8 portables must be purchased and 4 moved, for a cost of $63,900. The AISD estimates the cost of the

On the junior high school level,[10] all-black Kealing will be closed, and all of the Kealing students will be rezoned to other junior high schools. In addition, other minor zone changes will be made. A total of 939 black students (721 at Kealing, plus 242 zoned out of Allan, less 47 zoned into Martin) will be zoned out of East Austin. The resulting percentages of black students in the junior high schools will range from a low of 5.1 percent at O'Henry to a high of 25.2 percent at Allan, *See* footnote 9.

The district court's order will result in the closing of two all-black secondary schools, Anderson and Kealing, and the assignment of the students from these schools to zones of other secondary schools. The effect of the decree is to give a judicial blessing to substantial bussing—but only for blacks and a few Mexican-Americans. Under the district court's plan 2200 students (2350 according to the intervenors' estimate), virtually all blacks, will be transported distances varying from .8 miles to 12.5 miles.[11] No whites will be bussed according to the AISD plan approved by the Court.

Because the district court found no *de jure* segregation of Mexican-American students, they were afforded no relief except insofar as they are affected by the rezoning of *black* students. They are not even listed in the court's ethnic break-down of schools, see footnote 9, although the AISD furnished the court

senior high school plan at $459,785 and the junior high school plan at $207,855.

HEW projections for enrollment figures under the HEW plan reveal the following statistics:

| School | | Projected Enrollment | | | Grades |
|---|---|---|---|---|---|
| High Schools | *M-A* | *N* | *A* | *Total* | |
| Austin | 135 | 146 | 990 | 1271 | 10–12 |
| Crockett | 456 | 182 | 2194 | 2832 | 9–12 |
| Johnston | 622 | 632 | 987 | 2240 | 9–12 |
| Lanier | 420 | 101 | 2227 | 2748 | 9–12 |
| McCallum | 252 | 310 | 2067 | 2479 | 10–12 |
| Reagan | 303 | 729 | 1388 | 2420 | 9–12 |
| Travis | 858 | 43 | 943 | 1844 | 9–12 |
| Junior High Schools | | | | | |
| Allan | 228 | 10 | 281 | 519 | 7–8 |
| Anderson | 324 | 867 | 480 | 1671 | 7–9 |
| Burnet | 48 | 32 | 753 | 833 | 7–8 |
| Fulmore | 449 | 23 | 617 | 1089 | 7–8 |
| Lamar | 212 | 267 | 1059 | 1538 | 7–9 |
| O'Henry | 156 | 40 | 595 | 791 | 7–9 |
| Pearce | 116 | 182 | 901 | 1199 | 7–8 |
| Porter | 96 | 17 | 913 | 1026 | 7–8 |
| Martin | 547 | 25 | 117 | 689 | 7–8 |
| Murchison | 14 | 163 | 615 | 792 | 7–8 |
| Webb | 195 | 100 | 399 | 694 | 7–8 |

10. During the 1970–71 school year, there were 1570 black junior high school students, 15 percent of the total junior high school population, in the AISD. Of these, 739 (46 percent) attending Kealing, and 527 (33 percent) attended Martin and Allan. Kealing was all-black; Allan was 42 percent black, 54 percent Mexican-American, and 4 percent white; Martin was 11 percent black, 86 percent Mexican-American, and 3 percent white.

11. MILEAGE CHART for 1971 to 1973 PLAN

| SCHOOL | N | S | E | W |
|---|---|---|---|---|
| 1. Austin | 4.5 | .8 | 2.0 | 3.0 |
| 2. Crockett | 5.3 | 8.0 | 5.0 | 9.0 |
| 3. Johnston | 2.3 | 3.7 | 0.8 | 4.0 |
| 4. Lanier | 6.5 | 2.5 | 2.5 | 12.5 |
| 5. McCallum | 1.8 | 5.5 | 1.7 | 4.0 |
| 6. Reagan | 3.0 | 5.0 | 4.0 | 1.0 |
| 7. Travis | 2.5 | 1.7 | 1.5 | 2.0 |

Defendant's Exhibit No. 37

a tri-ethnic listing of schoolchildren. *See* Appendix A.

B. *Elementary Schools*. The district court approved, with minor modifications, the AISD "plan for the desegrega-tion" of the elementary schools. The district court described this "plan" as "a wholly new approach to the problems of desegregating elementary schools locked deeply in areas of urban minority concentration".[12] The plan will no doubt im-

12. Because the school system has expended a great deal of time and energy in the development of this plan, we feel it is appropriate to include the AISD's own description of the plan as found in the appellee's brief:

The prominent features then of the Davidson plan are: (1) the retention of the basic neighborhood school concept substantially modified; (2) utilization of new and developing techniques of education, i. e. team teaching, and application of this concept so as to team schools; (3) emphasis on the cultural variety of our three ethnic groups in such a way that wholesome attitudes are developed and all the students come to respect and appreciate the contributions of each ethnic group.

The plan of educational integration envisions the establishment of six teams of "companion schools." These are composed of one virtually all black school, one school predominately of Mexican-American students, and four schools of predominately Anglo enrollment. (See Defendant's Exhibit No. 78.) Within each team there is established a central coordinating committee consisting of the six principals, six teachers (one from each school, one to three instructional coordinators from the central administrations, resource personnel for special areas of concerned parents, and staff specialist. This multicultural committee, since it consists of representatives from minority and majority race students, will be called upon regularly to assess and review these planned educational programs. As a means of providing authentic evaluation from minority groups, one such committee will be established with a special supervisory group consisting of a predominantly number of minority representatives. This will assure continuing evaluation concerning activities for minority students.

The program activities have three basic components:

(1) Planned sequential visits between the schools of different ethnic backgrounds by grade levels and by groups of students;

(2) Programmed visitations to establish learning resource centers with the City. These centers will be established in the areas of social sciences, fine arts sciences, and avocational interests. Students will be transported for these education activities.

(3) Multi-cultural field study trips within the teams of companion schools.

Specific program activities are planned for these multi-cultural inter-site visitations. The coordinating planning advisory council for that team of schools would preplan the educational activities to be pursued by the specific students. This has been accomplished by one team for illustration to the district court and is continuing at the present time. In the inter-site visitations, a great number of educational possibilities exist. One example can be cited in the study of Texas history. Fourth grade students from each of these schools would study the developing history of Texas and the contributions made by the different ethnic groups in that history. Stressed particularly would be the contributions of Mexican-Americans and blacks, as well as Anglo citizens. The culture of each of the groups would be studied. In the inter-site visitations of these fourth grade students, this study would culminate with group discussions on an inter-ethnic basis, musical programs related to their studies, art forms prepared by the students depicting cultural development, dramatic skits presented in both Spanish and English with emphasis on the important contributions of each culture and how these cultures have helped produce the multi-cultural ethnic society in which we live today. Another possibility is the study of neighborhood and environmental conditions in which the various groups live. This provides an opportunity for understanding and appreciation of both the living conditions and the life styles of other people. Specific programs in literature, language, communications, history, sociology, music, art, drama, and practical arts are planned for these inter-site visitations.

The four learning resource centers, three of which were to be established in Anderson, Kealing, and Baker, provide opportunities for larger groups of stu-

prove cultural relations and communication among the three ethnic groups—but it is not a desegregation plan in any sense. Pupils, faculties, and staff remain in the same zones and schools where they were in the previous year. *See* Appendix A.

The 54 elementary schools are "clustered" into groups. Each cluster includes six schools—one predominately black, one predominately Mexican-American, and four predominately white.[13] One week a month the students of a cluster will meet together to engage in certain planned activities. The activities consist of (1) inter-school visits, (2) field trips, and (3) programs at "learning resource centers". The students will be divided into small instructional groups and will be taught fine arts, social sciences, science, and vocational courses during these meetings. Basic subjects, including reading and mathematics, will continue to be taught in the schools of original assignment. The students will be transported to these activities during the school day by the same busses which will transport secondary students to and from school at the beginning and the end of the school day. "Supervised on-bus activities" are also planned. In any system, but especially in a tri-ethnic system, the more the communication, the better. But, as the Assistant Attorney General pointed out in oral argument, "We just don't think that twenty-five percent desegregation converts a dual system to a unitary system". The dis-

trict court found "that elementary students would be in a desegregated environment as much as twenty-five (25) percent of the school year". The Government contends that the correct figure is 16 percent, while the AISD estimates the amount of time at 33 percent. We consider this interaction of Mexican-American, black, and white students an excellent idea for improving the group relationship, but it does not desegregate the schools.

As with the secondary schools, the district court refused to order any integration as to faculty and professional staff and apparently ignored the small number of Mexican-American teachers. Finally, the court ordered the closing of all-black St. Johns Elementary school and transfer of the St. Johns students to surrounding schools.

C. *The Bussing Issue*—The district court stated that "[b]y far the most pressing issue in this case is the extent to which transportation of students by bus should be utilized in achieving a unitary system" and recognized that bussing "falls within the Court's power to provide equitable relief", citing *Swann, supra.* In its order of June 28, 1971, the district court encouraged the parties to "combine the best elements of both their plans with a view toward minimizing bussing".

In its order of July 14, 1971 approving the AISD plans, the court reiterated most of the well-known disadvantages of bussing.[14] The court found that "bussing

---

dents to assemble together than is possible with inter-site visitations. The science resource center could be established at Baker, the center for avocational interest at Anderson, and the centers for fine arts and social sciences of Kealing. In these visits to the learning centers, students would have planned activities with large groups of students. These planned activities would include small group seminars, as well as the large groups. These centers will be equipped with materials and equipment, exhibits, displays, and demonstrations, which will emphasize both the dramatic areas of interest and the multi-cultural involvement. These centers provide

tremendous opportunities for educational enrichment on a multi-cultural basis.

13. The district court chose to include Mexican-American students in the elementary school plan despite the finding of no *de jure* segregation of Mexican-Americans.

14. The court concluded that bussing (1) "reduce[s] attendance and produce[s] higher dropout rates, especially among minority students" (2) "limit[s] the opportunity of all transported students to participate before and after school in extra-curricular activities", (3) "reduces parental participation in school activities", (4) "taxes the capability of health

to achieve desegregation in the Austin community will result in serious interference with the educational process" and approved the AISD plan "with a view toward minimizing bussing and maximizing the use of neighborhood schools". Nevertheless, the order legitimizes "interference" by bussing with the educational process of blacks in secondary schools. The court's decree has the effect of requiring the bussing of 2200 to 2350, or two-thirds, of the black secondary school students, some as far as 12.5 miles.

D. *The rejected HEW proposals.* The Department of Health, Education, and Welfare submitted desegregation proposals which were rejected by the district court. On the high school level, HEW suggested closing Anderson as a senior high school, but utilizing it as a junior high school; the Anderson students would be rezoned to surrounding high schools. The zone for Johnston High School would be redrawn to remove its racial identifiability. No high school would have a majority of black or Mexican-American students.[15] On the junior high school level, HEW proposed closing Kealing Junior High School and rezoning the Kealing students to other schools. Zone lines would be generally redrawn and bussing would be used to distribute students according to the ratio existing in the system as a whole. Under the HEW proposals, only Anderson and Martin Junior High Schools would continue to have a black and Mexican-American majority respectively.

The HEW plan for the elementary schools would employ the "clustering" concept, but differently from the AISD plan. Six schools—one predominately Mexican-American, one predominately black, and four predominately white— would be clustered on a permanent basis. Students would be reassigned to schools within the cluster and bussed to their assigned school; four of the schools within the cluster would be used for grades one through four, and two of the schools for grades five and six.[16] This is true desegregated clustering or pairing.

■ The district court recognized the presumption in favor of HEW recommendations:

> Normally, in fashioning a remedy, the recommendations of the Department of Health, Education & Welfare are entitled to great weight, United States v. Jefferson County Board of Education, 5 Cir. 1966, 372 F.2d 836, 847, and "the school districts are to bear the burden of demonstrating beyond question, after a hearing, the unworkability of the [HEW] proposals . . . ." Carter v. West Feliciana Parish School Bd., 1969, 396 U.S. 290, 292 [90 S.Ct. 608, 24 L.Ed.2d 477] (concurring opinion of Justice Harlan.)

The Court, however, rejected the HEW proposals stating, "It is the finding of this Court that defendants have met their

facilities in individual schools to deal with at-school injuries and illnesses", (5) "causes raised anxiety levels in both students and their teachers that constitute psychological barriers to learning progress, and subjects students to traumatic experiences that they are not equipped by age or experience to handle", (6) in "inclement weather may pose problems in sheltering up to twice the school's student capacity during the bussing period in the morning and afternoon", (7) "would require transporting many students through a heavy traffic complex", (8) would result in a "non-productive expenditure, since such costs contribute little, if anything, to academic achievement", and (9) creates "other bussing".

15. HEW estimated that high school transportation would cost $342,860 and junior high school transportation $240,320. The AISD disputes the accuracy of these figures.

16. HEW estimated that the cost of the elementary school plan would be $717,900. The AISD estimated that the HEW elementary plan would cost $1,708,000 and that the entire HEW plan would cost $2,910,575. As to the relevance of cost and administrative inconvenience, see Swann v. Charlotte-Mecklenburg Bd. of Education, 1971, 402 U.S. 1, 28, 91 S.Ct. 1267, 28 L.Ed.2d 554; Brewer v. School Bd. of City of Norfolk, 4 Cir. 1972, 456 F.2d 943.

burden of showing the non-feasibility of the HEW proposals . . . " Although the court did not make specific findings of fact and conclusions of law, there appear to be four reasons why the court found the HEW plan unacceptable. First, at least as to the junior high school plan, the court noted the "likelihood of 'white flight' " as a factor relevant to its consideration and rejection of the HEW plan. Second, as to the junior high schools, the court found the use of Anderson High School as a junior high school to be "unsatisfactory". Third, the court may have found, although this is not clear, that the HEW proposals, for all grade levels, to be too costly.[17] Finally, the court reiterated its views on bussing to which we have referred and found that the HEW proposals relied too heavily on bussing.[18]

## IV.

### Segregation of Mexican-Americans

A. *Mexican-Americans and Equal Protection.* In Hernandez v. Texas, 1954, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866, a case that appears in the United States reports immediately before *Brown I*, the petitioner, a Mexican-American, sought reversal of his Texas murder conviction on the ground that he had been denied equal protection of the laws because Mexican-Americans had been systematically excluded from service as jury commissioners, grand jurors, and petit jurors in the county in which he was convicted. The State of Texas argued "that there are only two classes—white and Negro—within the contemplation of the Fourteenth Amendment". 347 U.S. at 477, 74 S.Ct. at 670. The Supreme Court rejected the State's contention:

> Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection. Whether such a group exists within a community is a question of fact. When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated. The Fourteenth Amendment is not directed solely against discrimination due to a "two-class theory"—that is, based upon differences between "white" and Negro.

347 U.S. at 478, 74 S.Ct. at 670. As the decision in Hernandez demonstrated long ago, Mexican-Americans in Texas may constitute a separate class entitled to the equal protection guarantees of the fourteenth amendment. *See also* Yick Wo v.

---

17. The court found:

> Moreover, the HEW proposals for secondary schools disregard an additional cost of some $246,200 for portable buildings made necessary by the crowding of some facilities and drastic under-utilization of others under the HEW plan. Moreover, the cost comparison of the HEW [elementary school] proposal with that of AISD is startling. Because the AISD can employ during the school day at the elementary level the same buses used to transport secondary students, no additional equipment is required. Consequently, expenditures would be held to $100,000 in operating costs. Defendant's Exhibit 82. In this same exhibit, the

> AISD estimates that the HEW elementary proposal would cost $1,708,000.—$1,573,000. for transportation, and $135,000. for additional portable rooms. Even the Plaintiff's Exhibit 26, with its understatement of the number of buses required to implement the HEW Recommendations estimates total first year costs of $717,900. This Court finds as a matter of fact that, by either estimate, the cost of this proposal places an unreasonable burden upon the school district.

18. This Court finds as a matter of fact that their proposal entails all the educational disadvantages of bussing previously discussed.

District Court Order.

Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220.

The district court was clearly correct in holding that Mexican-Americans in Austin are a separate ethnic minority:

That Mexican-Americans constitute a separate ethnic group has been recognized by several earlier decisions: by this court in its appointment of a *Tri-Ethnic* as distinguished from a *Bi-Racial* Advisory Committee, by the testimony of AISD Superintendent, Dr. Jack Davidson, and by even the most casual examination of Mexican-American culture.

This finding is amply supported by the record and does not appear to be seriously contested in this appeal.[19] *See* Appendix B.

■ B. *Mexican-Americans in the AISD.*

(1) *The Applicable Standard.* Appendix B summarizes the results of the Civil Rights Commission's study of Mexican-American education in the Southwest.[20] Although the inferior educational status of Mexican-American students is apparent from this record,[21]

19. *See* Hernandez v. Texas, *supra*; Alvarado v. El Paso Independent School District, 5 Cir. 1971, 445 F.2d 1011 [No. 71–1555, June 16, 1971; Cisneros v. Corpus Christi Ind. School District, S.D. Tex.1970, 324 F.Supp. 599, appeal docketed, No. 71–2367, 5 Cir., 459 F.2d 13; Tasby v. Estes, N.D.Tex.1971, C.A. No. 3–4211–C, 342 F.Supp. 945, appeal docketed, No. 71–2581; Mendez v. Westminister School District, S.D.Cal.1946, 64 F.Supp. 544, aff'd 161 F.2d 774 (9 Cir. 1947); Delgado v. Bastrop Ind. School District, W.D.Tex.1948, C.A. No. 388 (unreported); Gonzales v. Sheely, D.Ariz.1951, 96 F.Supp. 1004; Romero v. Weakley, 9 Cir. 1955, 226 F.2d 399; Hernandez v. Driscoll Consol. Ind. School District, S.D.Tex.1957, 2 Race Rel.L.R. 329; Ind. School District v. Salvatierra, 33 S.W.2d 790 (Tex.Civ.App. 1930), cert. denied 284 U.S. 580, 52 S.Ct. 28, 76 L.Ed. 503 (1931); Clifton v. Puente, 218 S.W.2d 272 (Tex.Civ.App. 1948).

*See also* United States Comm'n on Civil Rights, Mexican-American Education Study, Ethnic Isolation of Mexican-Americans in the Public Schools of the Southwest (April 1971) [Report I]; United States Comm'n on Civil Rights, Mexican-American Educational Series, The Unfinished Education (October 1971) [Report II]; Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c et seq.; the U. S. Census of Population.

20. A summary of the Civil Rights Commission's conclusions is found on page 41 of Report I.

The basic finding of this report is that minority students in the Southwest—Mexican-Americans, blacks, American Indians—do not obtain the benefits of public education at a rate equal to that of their Anglo classmates. This is true regardless of the measure of school achievement used.

The Commission has sought to evaluate school achievement by reference to five standard measures; school holding power, reading achievement, grade repetitions, overageness, and participation in extracurricular activities.

Without exception, minority students achieve at a lower rate than Anglos: their school holding power is lower; their reading achievement is poorer; their repetition of grades is more frequent; their overageness is more prevalent; and they participate in extracurricular activities to a lesser degree than their Anglo counterparts.

21. See Appendix B. The AISD cannot seriously contend that the educational status of Mexican-Americans in Austin is significantly better than the status of Mexican-Americans throughout Texas as revealed in the Commission's reports. As to the segregation of Mexican-Americans in the AISD, see Appendix A. The relationship between racial segregation and educational, psychological, and social harms was established long ago. *See* Brown v. Bd. of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Sweatt v. Painter, 1950, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114; McLaurin v. Oklahoma State Regents, 1950, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149; Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv.L.Rev. 564 (1965); The Effects of Segregation and the Consequences of Desegregation: A Social Science Statement, 37 Minn.L.Rev. 427 (1953). We see no reason to believe that ethnic segregation is any less detrimental than racial segregation. *See* K.

we must determine if their segregation from whites or integration with blacks resulted from constitutionally impermissible state action. "Separate educational facilities are inherently unequal." Brown v. Board of Education, 1954, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873, 881.

■ Mexican-Americans in the AISD were never segregated as a result of any Texas Statute. But "de jure" segregation is not limited to statutory segregation. Soon after the ratification of the fourteenth amendment, judicial pronouncements declared the prohibitions contained therein applicable to all agencies of the states as well as to all

officers and agents by whom the powers of the state are executed. *See* Ex parte Virginia, 1880, 100 U.S. 339, 346–347, 25 L.Ed. 676. A school board is an agent of the state. *See* Cooper v. Aaron, 1958, 358 U.S. 1, 16, 78 S.Ct. 1401, 3 L.Ed.2d 5. The actions of the AISD are "state action" for purposes of the fourteenth amendment. Here school authorities assigned students, faculty, and professional staff; employed faculty and staff; chose sites for schools; constructed new schools and renovated old ones; and drew attendance zone lines. The natural and foreseeable consequence of these actions was segregation of Mexican-Americans. Affirmative action to the contrary would have resulted in desegregation.[22] When

Clark, Prejudice and Your Child (2d ed. 1963.) *See also* Coleman et al, Survey on Equality of Educational Opportunity (1966); Report I and Report II, *supra*, footnote 19.

22. Significantly, as the maps introduced into evidence demonstrate, the AISD drew zone lines which corresponded with ethnically and racially segregated neighborhoods. These neighborhoods were ethnically and racially isolated, not entirely because of personal choice or population growth but also because of state action in the location of public housing. In Blackshear Residents Organization v. Housing Authority of City of Austin, W.D.Tex.1971, 347 F.Supp. 1138 (W.D. Tex.1971), the district judge made the following findings:

These obviously segregated patterns of occupancy and site location in the Austin public housing system were brought about in large measure through the conscious design of the Housing Authority and with the knowing approval of HUD and its predecessor agency, the Public Housing Administration.

Beginning in the late 1930's and early 1940's the Housing Authority began segregating the three ethnic groups by building the first three projects, Chalmers Courts for Anglos, Rosewood for Negroes and Santa Rita Courts for Mexican-Americans, in accordance with an official Austin city plan adopted in 1928, that had as its purpose to encourage the settlement of Negroes in "East Austin" and pursuant to a City Planning Commission Resolution approving the Housing Authority's request to locate these "three racial

housing projects" on sites the Planning Commission found to be fitting to their racial character. This City plan was still in effect during the 1950's when Meadowbrook, Booker T. Washington Terrace and Santa Rita Addition were built. Then in the 1960's the Housing Authority built two projects for the elderly, Lakeside for Anglos and Rosewood Addition for Negroes, intending at the time to segregate the tenants by race. *The evidence shows and this Court finds that from 1938 to 1967, it was the official policy of the Housing Authority to segregate Anglos, Negroes and Mexican-Americans into different public housing projects.* On October 27, 1967, the Board of Commissioners of the Housing Authority finally adopted a resolution abandoning the prior system of segregation and adopted a "freedom of choice" plan. During the prior 28 years, however, public housing in Austin was designed, named, located for and occupied by particular racial or ethnic groups. The result has been that the various projects have historically been identified as Anglo, Negro and Mexican-American, and while a substantial number of Mexican-Americans have lately been admitted to formerly all Anglo projects, the basic racial or ethnic identification remains. (Emphasis supplied).

Whether or not the residential isolation of whites, blacks, and Mexican-Americans in Austin is, as the finding of the district court would seem to indicate, the result of state action, the acts of the school authorities in taking official action, including assigning students, choosing sites for schools, constructing and renovating

school authorities, by their actions, contribute to segregation in education, whether by causing additional segregation or maintaining existing segregation, they deny to the students equal protection of the laws.[23]

We need not define the quantity of state participation which is a prerequisite to a finding of constitutional violation. Like the legal concepts of "the reasonable man", "due care", "causation", "preponderance of the evidence", and "beyond a reasonable doubt", the necessary degree of state involvement is incapable of precise definition and must be defined on a case-by-case basis. Suffice it to say that school authorities here played a

significant role in causing or perpetuating unequal educational opportunities for Mexican-Americans, and did so on a system-wide basis.

■ (2) *Cause and Perpetuation.* The district court found that "at no time during the existence of the AISD has there been *de jure* segregation against Mexican-Americans".[24] If this statement is considered a finding of fact, it is clearly erroneous. F.R.Civ.P. 52. If it is a conclusion of law, it is incorrect. If, as seems most likely, it involves application of the assumed law to the facts, we disagree with the district court's application of the law.[25] Applying the standard discussed in the previous section to the

schools, and drawing zone lines, on the basis of these segregated housing patterns were violative of the fourteenth amendment. When the segregated housing patterns are the result of "state action", we are faced with *double* discrimination.

23. *See* United States v. School Dist. 151, 7 Cir. 1968, 404 F.2d 1125, modified, 432 F.2d 1147 (1970) ; cert. denied 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 (1971) ; Spangler v. Pasadena City Bd. of Educ., C.D.Cal.1970, 311 F.Supp. 501, intervention denied, 9 Cir. 1970, 427 F.2d 1352 ; Kelley v. Brown, Civ.No. LV–1146 (D.Nev., Dec. 2, 1970) ; Davis v. School Dist., E.D.Mich. 1970, 309 F.Supp. 734, aff'd, 6 Cir. 1971, 443 F.2d 573, cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971) ; Crawford v. Bd. of Educ., Civ. No. 822854 (Sup.Ct. L.A. County, Feb. 11, 1970) ; Johnson v. San Francisco Unified School Dist., N.D.Cal. 1971, 339 F.Supp. 1315 ; Soria v. Oxnard School Dist., C.D.Cal.1971, 328 F.Supp. 155 ; United States v. Bd. of School Comm'rs, S.D.Ind.1971, 332 F.Supp. 655 ; Bradley v. Milliken, E.D.Mich.1971, 338 F.Supp. 582 ; Taylor v. Bd. of Educ., 2 Cir. 1961, 294 F.2d 36, cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961) ; Blocker v. Bd. of Educ., E.D. N.Y.1964, 226 F.Supp. 208 ; Branche v. Bd. of Educ., E.D.N.Y.1962, 204 F.Supp. 150 ; Clemons v. Bd. of Educ., 6 Cir. 1956, 228 F.2d 853, cert. denied, 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956). "[T]he segregation of school children because of their race has been contrary to the law of Ohio for almost seventy years. The Hillsboro Board of Education created the gerrymandered school districts after the Supreme Court

had announced its first opinion in the segregation cases. *The Board's action was, therefore, not only entirely unsupported by any color of state law, but in knowing violation of the Constitution of the United States.* The Board's subjective purpose was no doubt, and understandably, to reflect the 'spirit of the community' and avoid 'racial problems', as testified· by the Superintendent of Schools. But the law of Ohio and the Constitution of the United States simply left no room for the Board's action, *whatever motives the Board may have had.*" 228 F.2d at 859 (concurring opinion of Stewart, J. as Circuit Judge) (emphasis added.) See Fiss, the Charlotte-Mecklenburg Case—Its Significance for Northern School Desegregation, 38 U.Chi.L.Rev. 697 (1971) ; Dimond, School Segregation in the North ; there is But One Constitution, 7 Harv.Civ.R.-Civ.Lib.L.Rev. 1 (1971) ; Comment, Bussing, Swann v. Charlotte-Mecklenburg, and the Future of Desegregation in the Fifth Circuit, 49 Tex.L.Rev. 884 (1971) ; Fiss, Racial Imbalance in the Public Schools: The Constitutional Concepts, 78 Harv.L.Rev. 564 (1965).

24. See footnote 6.

25. The district court may have applied an erroneous legal standard. The standard which the court applied to Mexican-Americans is unclear, as to blacks the court's most explicit statement of the standard that it was applying is found in its "Memorandum Opinion and Order" of June 28, 1971.

The government has made no showing that in the period from 1955 to the present the AISD has intentionally perpetuated segregation of Blacks ; the record

instant case, we hold that the AISD has, in its choice of school site loca-

tions,[26] construction and renovation of schools,[27] drawing of attendance zones,[28]

instead indicates that during this period the school administration's official acts have not been motivated by any discriminatory purpose.

This standard, with its reliance on motivation, is incorrect. *See* Brown v. Bd. of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Brown v. Bd. of Education, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083; Griffin v. County School Board of Prince Edwards County, 1964, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256. *See also* Palmer v. Thompson, 1971, 403 U.S. 217, 225, 91 S.Ct. 1940, 1945, 29 L.Ed.2d 438, 445.

It is not necessary to prove discriminatory motive, purpose, or intent as a prerequisite to establishing an equal protection violation when discriminatory effect is present. See Palmer v. Thompson, 1971, 403 U.S. 217, 225, 91 S.Ct. 1940, 1945, 29 L.Ed.2d 438, 445; Griffin v. County School Board of Prince Edwards County, 1964, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256; Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110; NAACP v. Button, 1963, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed. 2d 405; Brown v. Bd. of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Brown v. Bd. of Education, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083; Henry v. Clarksdale Municipal Separate School District, 5 Cir. 1969, 409 F.2d 682; Hobson v. Hansen, D.D.C.1967, 269 F.Supp. 401, aff'd sub nom. Smuck v. Hobson, 1969, 132 U.S.App.D.C. 372, 408 F.2d 175; United States v. Jefferson County Board, 5 Cir. 1966, 372 F.2d 836, adopted en banc 380 F.2d 385 (5 Cir.) cert. denied 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967); Bush v. Orleans Parish School Board, E.D.La. 1960, 190 F.Supp. 861, aff'd 366 U.S. 212, 81 S.Ct. 1091, 6 L.Ed.2d 239 (1961).

This is not to say that proof of motive, purpose or intent may not reinforce a finding of racial discrimination or serve as a basis for such a finding. *See* Hall v. St. Helena Parish, E.D.La.1961, 197 F.Supp. 649, aff'd 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521 (1965); Davis v. Schnell, S.D.Ala.1949, 81 F.Supp. 872, aff'd 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093; Poindexter v. La. Financial Assistance Commission, E.D.La.1967, 275 F. Supp. 833, aff'd 389 U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968); Hobson v. Hansen, D.D.C.1967, 269 F.Supp. 401, aff'd sub nom. Smuck v. Hobson, 1969, 132 U.S.App.D.C. 372, 408 F.2d 175;

Johnson v. Branch, 4 Cir. 1966, 364 F.2d 177; Chambers v. Hendersonville City Bd. of Educ., 4 Cir. 1966, 364 F.2d 189; Downs v. Bd. of Education, 10 Cir. 1964, 336 F.2d 988; Taylor v. Bd. of Education, 2 Cir. 1961, 294 F.2d 36; Brest, Palmer v. Thompson: An Approach to the Problem of Unconstitutional Legislative Motivation, 1971 S.Ct.Rev. 95 (1971); Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205 (1970); Note, Legislative Purpose and Federal Constitutional Adjudication, 83 Harv.L.Rev. 1887 (1970); Comment, The Constitutionality of Sex Separation in School Desegregation Plans, 37 U.Chi.L.Rev. 296 (1970).

26. See Swann v. Charlotte-Mecklenburg Bd. of Education, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554.

27. The construction of new schools and the closing of old ones are two of the most important functions of local school authorities and also two of the most complex. They must decide questions of location and capacity in light of population growth, finances, land values, site availability, through an almost endless list of factors to be considered. The result of this will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system. Over the long run, the consequences of the choices will be far reaching. People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods. In the past, choices in this respect have been used as a potent weapon for creating or maintaining a state-segregated school system. In addition to the classic pattern of building schools specifically intended for Negro or white students, school authorities have sometimes, since Brown, closed schools which appeared likely to become racially mixed through changes in neighborhood residential patterns. This was sometimes accompanied by building new schools in the areas of white suburban expansion farthest from Negro population centers in order to maintain the separation of the races

student assignment and tranfer policies,[29] and faculty and staff assignments,[30] caused and perpetuated the segregation of Mexican-American students within the school system.

It is true, as the district court noted, that "Texas has never required by law [statute] that Mexican-American children be segregated, and the AISD, unlike some other school systems, has never enacted regulations to that effect". Before the 1954 Supreme Court decision in *Brown,* Mexican-Americans were not segregated, as blacks were, by any formal or rigid means. Evidence at trial, however, reveals the existence of an all-Mexican-American school, West Avenue, as early as 1916. West Avenue shared a dual-overlapping zone with Pease, an all-

white school. Whites within the zone went to Pease, and Mexican-Americans attended West Avenue. West Avenue continued to operate as a Mexican-American school until it was closed in 1947. Canal Street School was opened in 1924. School Board minutes reflect that the school was built to accommodate Mexican-American students attending three other schools. These three schools were the only schools in the district with more than twenty Mexican-Americans.

In 1934, West Avenue and Canal Street enrolled 45 percent of the district's Mexican-American students; Bickler had about 25 percent and Metz about 15 percent. After the passage of a bond issue, Zavala school opened. The site for the new school was three blocks from the

with a minimum departure from the formal principles of "neighborhood zoning." Such a policy does more than simply influence the short-run composition of the student body of a new school. It may well promote segregated residential patterns which, when combined with "neighborhood zoning," further lock the school system into the mold of separation of the races. Upon a proper showing a district court may consider this in fashioning a remedy. In ascertaining the existence of legally imposed school segregation, the existence of a pattern of school construction and abandonment is thus a factor of great weight. In devising remedies where legally imposed segregation has been established, it is the responsibility of local authorities and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or reestablish the dual system. Swann v. Charlotte-Mecklenburg Bd. of Education, 1971, 402 U.S. 1, 20–21, 91 S.Ct. 1267, 1278, 28 L.Ed.2d 554; *see* United States v. Montgomery County, 1969, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263; United States v. Bd. of Public Instruction, 5 Cir. 1968, 395 F.2d 66; Lee v. Macon County Bd. of Education, M.D.Ala., 267 F.Supp. 458, aff'd Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967).

28. *See* Swann v. Charlotte-Mecklenburg Bd. of Education, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554; Goss v. Bd. of Education, 1963, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632; Monroe v.

Bd. of School Comm'n, 1968, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733; Henry v. Clarksdale Municipal Separate School District, 5 Cir. 1969, 409 F.2d 682; United States v. Jefferson County Bd. of Education, 5 Cir. 1966, 372 F.2d 836, aff'd en banc, 5 Cir. 1966, 380 F.2d 385, cert. denied 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

29. *See* Brown v. Bd. of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Brown v. Bd. of Education, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083; Green v. County School Bd., 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716; Swann v. Charlotte-Mecklenburg Bd. of Education, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554.

30. *See* United States v. Montgomery County Bd. of Education, 1969, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263; Swann v. Charlotte-Mecklenburg Bd. of Education, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554; Davis v. Bd. of School Comm'rs, 1971, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577; Rogers v. Paul, 1965, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265; Bradley v. School Bd., City of Richmond, Va., 1965, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187; Green v. County School Bd., 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716; United States v. Jefferson County Bd. of Education, 5 Cir. 1966, 372 F.2d 836, aff'd en banc, 5 Cir. 1967, 380 F.2d 385, cert. denied sub nom. Caddo Parish School Bd. v. United States, 1967, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103; United States v. Bd. of Education of City of Bessemer, 5 Cir. 1968, 396 F.2d 44.

Mexican-American Canal Street school which was then closed. Zavala shared a dual-overlapping zone with Metz, one of two predominately white schools with significant numbers of Mexican-American students. Mexican-Americans were expected to and did attend Zavala; whites attended Metz. This is unadulterated segregation. West Avenue and Zavala, predominately Mexican-American, were the only schools in the district which shared zones with other schools. By 1940, West Avenue and Zavala enrolled 56 percent of the AISD's Mexican-American students, Also at the time Zavala was built in 1935, Bickler, the other predominately white school with a significant number of Mexican-American students, was discontinued as an elementary school, and Bickler students were sent to other schools. It is unclear as to where these students went, although some were reassigned to Winn, Palm, and Metz (Zavala). In 1939, a committee from Winn complained of the assignment of Mexican-American students from Bickler to Winn. Soon thereafter, some of these students were reassigned to Bickler.[31]

As is evident, the AISD used dual-overlapping attendance zones, student assignment policies, and site selection to segregate Mexican-American students in the years prior to 1954. After the Supreme Court decision in Brown, the AISD nominally undertook to abolish the dual system based on separate schools for blacks and whites. But the Board continued to perpetuate segregation of Mexican Americans. See Appendix C. In 1953, O'Henry Junior High School opened in the western section of Austin. At that time the zone line for Allan Junior High School, a predominately Mexican-American facility, was moved so that many whites were zoned out of Allan and into O'Henry. In 1956, Allan

Junion High burned down. The new Allan Junior High School was built on the same site as the old school and opened in 1957 with 75 percent Mexican-American enrollment. In addition, the Allan Zone line was moved so that fewer whites were included in the new zone.

In 1960, the new Johnston High School was opened in East Austin. The suggestion for a central location for this facility was rejected, and the school was built deep in a Mexican-American area. It opened with a 78 percent Mexican-American enrollment. In 1967, University Junior High School was closed because the University of Texas reclaimed the property where the school was located. Martin Junior High School was built in the heart of the Mexican-American community. Again, centrally-located sites for the new facility were considered and rejected. Martin opened with 77 percent Mexican-American enrollment. White students who had formerly attended University Junior High School were zoned to predominately-white junior high schools rather than to Martin.

The elementary school zone lines have remained static in East Austin during the years following Brown. As a result, the schools have become increasingly overcrowded as the school population increased. Several new elementary schools have been built to relieve overcrowded conditions in areas outside of East Austin. In the seven predominately-Mexican-American schools in East Austin portable classrooms have been supplied, instead.[32]

The actions of the AISD have had their effect. There are ten predominately Mexican-American schools in the AISD. See Appendix A. Fifty-four percent of the Mexican-American high school students, 60 percent of the Mexican-American junior high school students, and 64

31. The pre-Brown record reveals little evidence as to the segregation of Mexican-American school students. Because of the extremely high dropout rate among Mexican-American students, very few continued their formal education through high school.

32. The 39 predominately white elementary schools outside of East Austin have a total of 44 portable classrooms; the seven Mexican-American schools in East Austin have a total of 24 portables.

percent of the Mexican-American elementary students attend predominately-Mexican-American schools.

Of 29 schools opened since 1954, 19 had a white enrollment of 90 percent or more. Seven of these were all-white. Of the 29, 21 had no blacks, 10 had no Mexican-Americans, 8 had less than 5 percent Mexican-Americans (some 1, 3 or 4 Mexican-American students). See Appendix C containing the ethnic make-up of the student bodies in all schools built after 1954.

There is no evidence in the record as to the AISD's declared policies on practices of hiring teachers. The statistics which are in evidence reveal that Mexican-American students constitute 15 percent of the district's high school enrollment, 19 percent of the junior high school enrollment, and 23 percent of the elementary school enrollment. Mexican-American teachers, however, constitute something short of 3 percent of the district's high school teachers, 2 percent of the junior high school teachers, and 3 percent of the elementary school teachers. The record shows no explanation for the disproportionately small number of Mexican-American teachers in the system. For detailed statistics on faculty and staff assignments, see Appendix A. Sixty-five percent of the Mexican-American high school teachers, 36 percent of the Mexican-American junior high school teachers, and 77 percent of the Mexican-American elementary teachers are assigned to predominately Mexican-American schools.

The AISD raises several arguments in defense. First, the AISD attempts to justify student assignments by pointing out that, even assuming Mexican-Americans were segregated by school board actions, the students were always free to transfer to predominately-white schools. This is no more than saying that the Board followed a "freedom of choice" plan for Mexican-Americans. When freedom of choice fails to "work", the school board is under a constitutional duty to adopt a workable alternative. See Green v. County School Bd., 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716; Raney v. Board of Education, 1968, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727; Goss v. Board of Education, 1963, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632.

Second, the AISD argues that the school enrollment statistics refute any charge of ethnic segregation. The Board says, "Defendant's Exhibit No. 69 reflects that there has never been a year when Mexican-American children were not present at almost all schools in the District and on all levels." Examination of these figures reveals not only that they do not support the AISD's conclusion, but also that they effectively illustrate a high degree of ethnic segregation within the system. The exhibit lists Austin as the only high school and reports enrollment figures only as of 1933. At that time there were 1665 white students in Austin High and 18 Mexican-Americans. These out-of-date figures can hardly be said to be applicable today. Current statistics reflect the degree of ethnic segregation at the high school level. See Appendix A. Similarly, the exhibit lists only Allan Junior High School; as of 1934 the enrollment was 1166 whites and 70 Mexican-Americans. Current statistics show only three of the eleven junior high schools with Mexican-American enrollment as great as the proportion of Mexican-Americans within the system, and these three—Allan, Fulmore, and Martin—have greatly disproportionate Mexican-American enrollment. See Appendix A. Finally, the exhibit lists incomplete and, in many cases, out-of-date enrollment figures for the elementary schools. Current statistics again reflect the segregation of Mexican-American students. See Appendix A.

The School Board discusses at length the purported reasons for what it terms "extra attention and help" for Mexican-American students. The Board discusses the special problems of children of migrant labor families who arrive at school late in the fall semester and may be withdrawn early in the spring, the language deficiencies of Mexican-American chil-

dren, and the retarded educational development of many of these children. This Court has earnestly undertaken to understand the problems the AISD faced in attempting to educate this ethnic minority. The problems are formidable. We admire the AISD for its unquestionably sincere efforts in this area. Yet, we are not convinced that, to meet the special educational needs of Mexican-American children, the AISD had to keep these children in separate schools, isolate them in Mexican-American neighborhoods, or prevent them from sharing in the educational, social, and psychological benefits of an integrated education. See Brown v. Bd. of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. A benign motive will not excuse the discriminatory effects of the school board's actions.

Finally, the AISD asks, if the changes brought by segregation are sound, why did the plaintiffs not present more evidence to substantiate those changes? We read the record as showing that in the district court the Government presented ample evidence to sustain its burden of proof in this case.

█ (3) *Adoption of a Plan Exclusive of Mexican-Americans.* The district court found "vestiges of state-imposed segregation" as to black students and adopted a plan to deal with this racial segregation. The act of dismantling a dual system based on race and providing equal educational opportunity for black students is in itself state action. When that state action has the effect of denying equal educational opportunity to Mexican-Americans, the Equal Protection Clause has been violated. Today we add that school authorities must make the benefits of desegregation available to all on equal terms.

Despite the district court's declaration that it would consider the effect of any segregation plan upon Mexican-Americans, the plan that was approved intensifies the isolation of this group in Austin's secondary schools. Under the district court's plan, the student body at Johnston High School, which is currently 62 percent Mexican-American, would become 71 percent Mexican-American. The student body at Allan Junior High School, currently 54 percent Mexican-American, would became 72 percent Mexican-American. (The reason for the changes is that some black students currently assigned to these majority Mexican-American schools would be assigned elsewhere under the district court's plan.) Only at Martin Junior High School is the pattern reversed. There, additional black students will join the predominately Mexican-American student body, so that the school will become 83 percent Mexican-American rather than 86 percent Mexican-American as it is at present.

█ The present case presents the special problem of dismantling a dual system based on race within the context of a tri-ethnic school system. No remedy for the dual system can be acceptable if it operates to deprive members of a third ethnic group of the benefits of equal educational opportunity.[33] To dismantle the black-white segregation system without including the third ethnic group in the desegregation process would be to deny to that group all of the benefits of integrated schooling which the courts of this nation have been protecting for twenty years. To exclude Mexican-Americans from the benefits of tripartite integration in the very act of effecting a unitary system would be to provide blacks with the benefit of integration while denying it to another (and

---

**33.** The plan adopted by the district court not only operates to the detriment of Mexican-Americans in theory but also in practice. Under the plan the student body of Johnston, currently 62 percent Mexican-American, would become 71 percent Mexican-American. Similarly, at Al-

lan Junior High School the 54 percent Mexican-American student body would become 72 percent Mexican-American. The plan, on the other hand, provides that no secondary school will have a student body more than 25 percent black.

larger) group on the basis of ethnic origin. This in itself is a denial of equal protection of the laws.[34]

## V.

### Segregation of Blacks

 The district court held with regard to black students:

It is undisputed that at one time the AISD maintained a dual school system with educational opportunities separate and inherently unequal for Blacks. However, unlike many communities elsewhere in the South, the City of Austin has since *Brown II* adopted a progressive and non-discriminatory policy in the administration of its public schools. The government has made no showing that in the period from 1955 to the present the AISD has intentionally perpetuated segregation of Blacks; the record instead indicates that during this period the school administration's official acts have not been motivated by any discriminatory purpose. The Court therefore deals in this case only with vestiges of state-imposed segregation, in the form of some all-white and all-black schools, that survived under a racially-neutral policy on the part of the local authorities.

We hold that the AISD has not dismantled the state-imposed system [35] based on race.[36] "The burden on a school board today is to come forward with a plan that promises realistically to work . . . *now* . . . until it is clear that state-imposed segregation has been completely removed." Green v. County School Bd., 1968, 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716, 724.

There are 2100 black high school students in the AISD. Of these, 916 [43 percent] attend Anderson High School which is 98 percent black, and 619 [29 percent] attend Johnston High School which is 32 percent black and 62 percent Mexican-American. There are 1570 black junior high school students. Of these, 739 [46 percent] attend Kealing which is 98 percent black, and 527 [33 percent] attend Allan and Martin which have 96 and 97 percent minority enrollment respectively. There are 4614 black elementary students. Of these, 3645 [79 percent] attend predominately black elementary schools. There are 18 schools in East Austin with greater than 90 percent minority enrollment. Of these schools, eight are over 95 percent black and 6 have over 90 percent combined black and Mexican-American enrollment. There are 31 schools in the AISD with greater than 90 percent white enrollment.[37]

The AISD has not fulfilled its "affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch". Green v. County School Bd., 1968, 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716, 723.

---

34. The district court said that it would "consider the effect upon [Mexican-Americans] . . . of any plan submitted by the parties." This is not sufficient. The Mexican-American students must be specifically included in the plan and its operation. The district court apparently chose to include Mexican-American students in the elementary school plan despite the finding of no "*de jure*" segregation" of Mexican-Americans.

35. *See* Tex.Const. art. 7, Section 7 (1873); Texas Laws 1905, Ch. 124 at 263; Texas Laws 1957, Ch. 283, §§ 1 and 3 at 671.

36. Although we agree with the district court that the AISD has not fully dismantled its dual system based on race and,

therefore, agree that the plaintiffs are entitled to relief, we disagree with the court's conclusions as to the absence of post-*Brown*, discrimination. We hold that the AISD has, in its choice of school site locations, construction and renovation of schools, drawing of attendance zones, student assignment and transfer policies, and faculty and staff assignments, caused and perpetuated the segregation of black students within the school system.

37. The district court found that "the AISD has adequately desegregated faculty and staff." With the exceptions noted above as to Mexican-American teachers, we agree.

## VI.

### The Relief

"The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation." *Swann v. Charlotte-Mecklenburg Bd. of Education,* 1971, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554. We have held that the AISD has operated and continues to operate a school system which fails to provide equal educational opportunity for Mexican-American and black students. "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann, supra,* 402 U.S. at 15, 91 S.Ct. at 1276.

The Supreme Court said in *Swann,* "The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole". 402 U.S. at 24, 91 S.Ct. at 1280. "The district judge or school authorities should make every effort to achieve *the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools."* 402 U.S. at 26, 91 S.Ct. at 1281. (emphasis supplied). The Court recognized the importance of an "[a]wareness of the racial composition of the whole school system * * * in shaping a remedy" and, speaking of one-race schools, all-minority or all-majority, said:

> Schools all or predominately of one race in a district of mixed population will require close scrutiny to determine that school assignments are not part of state-enforced segregation. . . . No *per se* rule can adequately embrace all the difficulties of reconciling the competing interests involved; but in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its

constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition. Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominately of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory. The Court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part. *Swann, supra,* 402 U.S. at 25–26, 91 S. Ct. at 1281.

In short, while precise racial or ethnic balance in each school is not required, and there may even be schools of one race that pass the *Swann* test, school authorities must convert to a unitary school system—the eradication by affirmative action of all vestiges of segregation. They must "achieve the greatest possible degree of actual desegregation". *Swann, supra,* 402 U.S. at 26, 91 S.Ct. at 1281; *Davis v. Board of School Comm'rs,* 1971, 402 U.S. 33, 37, 91 S.Ct. 1289, 28 L.Ed.2d 577. One-race schools, all-minority or all-majority, will require "close scrutiny"; there is "a presumption against schools that are substantially disproportionate in their racial composition". *Swann, supra,* 402 U.S. at 26, 91 S.Ct. at 1281.

A. *Secondary Schools.* The district court's order provided for desegregation of the AISD secondary schools but did not include Mexican-American students in the plan. As we have held, this was erroneous. The school system must be converted to a unitary system on a tri-ethnic, desegregated basis.[38]

The district court's order requires the closing of two all-black schools and the transfer of the students from those schools to other schools in the system.

---

38. Conversion may not be accomplished merely by putting Mexican-American and blacks in the same school.

The effect of this requirement is to impose the burdens of desegregation, including bussing, on only one group, the blacks. This Court has previously held that "[c]losing schools for racial reasons would be unconstitutional". Lee v. Macon County, 5 Cir. 1971, 448 F.2d 746, 753. In accord are: Brice v. Landis, N. D.Cal.1969, 314 F.Supp. 974; Quarles v. Oxford Municipal Separate School Districts, N.D.Miss.1970, No. WC–6962–K (unreported); Haney v. County Bd. of Education, 8 Cir. 1970, 429 F.2d 364; Green v. School Bd. of City of Roanoke, W.D.Va.1970, No. 1093 (unreported); Smith v. St. Tammany Parish School Bd., E.D.La.1969, 302 F.Supp. 106; Choctaw County Bd. of Education v. United States, 5 Cir. 1969, 417 F.2d 845; Carr v. Montgomery County Bd. of Education, 5 Cir. 1970, 429 F.2d 382. When the closing of a formerly all-black school is proposed, "there is a heavy burden on the school board, and in the instant case on the District Court since its Order made mandatory [the closing of the black schools] to explain the closing of facilities formerly used for the instruction of black students". *Haney, supra,* 429 F.2d at 372.

Here, there was no showing that Anderson and Kealing were closed for nonracial reasons. The Anderson site contains 20.4 acres and has a capacity for 1,200 students. While its size may be inadequate for a senior high school it is clearly within the desirable junior high school size range. The predominately white Austin High School, by comparison, has only 16.4 acres, and a capacity of 1,600–1,800, yet it has not been closed. Kealing, with 9.85 acres of land, has twice the acreage of the predominately white Fulmore Junior High School (4.-81 acres) and approximately the same acreage as Martin Junior High School (9.92). The only reason stated for closing Kealing is that "it needs repairs;"

Superintendent Davidson admitted its space was adequate.

There is evidence in the record for the conclusion that, as the district court described it, "likelihood of 'white flight' " was the real reason for the closing of the two schools. "But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them." Brown v. Bd. of Education, *supra,* 349 U.S. at 300, 75 S.Ct. at 756. *See* Lee v. Macon County, 5 Cir. 1971, 448 F.2d 746; Cooper v. Aaron, 1958, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19; Monroe v. Bd. of Commrs., 1968, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733. On the record before us, the closings are unacceptable.

B. *Elementary Schools.* As previously discussed, the district court approved the Board's plan adopted for the desegregation of the elementary schools by bringing black, white, and Mexican-American students together for integrated learning experiences one week per month. This is a constructive, innovative idea but only as a supplement to system-wide desegregation. Part-time desegregation does not meet constitutional requirements.[39] At a time when federal courts throughout the country are enforcing the constitutional mandate that school systems must be unitary, the AISD may not escape the constitutional requirements by a plan such as this.

The court-approved plan leaves all the elementary students in their 1970–71 schools. *See* Appendix A. Virtually 80 percent of the blacks and 64 percent of the Mexican-Americans will attend schools where their race or ethnic group predominates. They will be taught all of their basic subjects including reading and mathematics in a segregated learning environment. Whether their part-

---

39. See Bivins v. Bibb County, 5 Cir. 1970, 424 F.2d 97; United States v. Bd. of Education of Baldwin County, 5 Cir. 1970, 423 F.2d 1013; Hilson v. Ouzts, 5 Cir. 1970, 421 F.2d 632; Hightower v. West, 5 Cir. 1970, 430 F.2d 552; United States v. Bd. of Education of Webster County, 5 Cir. 1970, 431 F.2d 59; Banks v. Claiborne Parish, 5 Cir. 1970, 425 F.2d 1040.

time integration occupies 25 percent of their school years, as the district court held, 16 percent as the Government contends, or 33 percent as the AISD contends, the plan cannot be said to fulfill the constitutional command to "convert to a *unitary* system in which racial discrimination would be eliminated root and branch". (Emphasis supplied.) Green v. County School Board, *supra,* 391 U.S. at 437–438, 88 S.Ct. at 1694.

Lest we be misunderstood, we congratulate the AISD for some of its progressive educational techniques including the use of inter-cultural experiences, team-teaching, and instruction in the cultural background and heritages of racial and ethnic groups. Further, the AISD may provide for bi-lingual instruction, accelerated education, and remedial education for retarded students. These techniques, however, may not be used as a substitute for adequate desegregation. *See* George v. O'Kelly, 5 Cir. 1971, 448 F.2d 148; Banks v. Claiborne Parish, 5 Cir. 1970, 425 F.2d 1040.

C. *Faculty and Professional Staff.* In United States v. Montgomery County Board of Education, 1969, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263, the Supreme Court held that, as a goal, in each school the ratio of white to black teachers should be substantially the same as the ratio of white to Negro teachers throughout the system. The black-white faculty ratio in that case substantially reflected the black-white student ratio. *Swann* reaffirmed this principle. Rigid adherence to this principle would be inequitable in this case, however, since there are so few Mexican-American teachers, 3 percent of the total faculty as against a Mexican-American school population of 20 percent.

When the figures speak so eloquently, a *prima facie* case of discrimination is established. *See* Swann v. Charlotte-Mecklenburg Bd. of Education, *supra;* Brooks v. Beto, 5 Cir. 1966, 366 F.2d 1. The school board therefore should attempt to employ more Mexican-American teachers with the goal of attaining a ratio of Mexican-American teachers within the faculty that reflects more truly the ratio of Mexican-American students to the total population. *The school board need not, of course, lower its employment standards.* A showing of a good faith effort to find sufficient qualified Mexican-American teachers to achieve an equitable ratio, will rebut any inference of discrimination. The ultimate goal is to apply the faculty rule laid down in United States v. Montgomery County Board of Education.

D. *Conversion to Unitary System.* The Department of Justice advanced the notion on appeal that as to Mexican-Americans, there were only "incidents [pockets] of discrimination" in certain schools. The Government asks, therefore, that only these "incidents" be remedied on remand, rather than ordering across-the-board relief. One is not sure what the Department means. It has never asserted this position before.

The statistics in this case, as in almost all school cases, prove a pattern of discrimination. The statistics supplemented by maps in evidence graphically show a heavy concentration of students of one race in a school in an area where there is a heavy concentration of residents of that race. *See* Appendix A and footnote 22. Essentially, however, considering only the Mexican-Americans, this case is no different from any other school desegregation case. What the Department now refers to as proof only of piecemeal or pocket discrimination has always been its tried and true method of proving school segregation. The discriminatory acts of the school authorities infect the entire school system; they are particularly obvious in the so-called "pockets". Some schools may be the "result" of state-imposed segregation even though no specific discriminatory school board action may be shown *as to* those schools. Had the school authorities not specifically segregated the minority students in certain schools, other schools may have developed as desegregated facilities. Thus, though they may not be "pockets of discrimination", these schools are the "results" of discrimination. They must

pass the scrutiny test mandated by *Swann. See* 402 U.S. at 25–26, 91 S.Ct. 1267, 28 L.Ed.2d 554.

For this Court to provide relief only for certain pockets, euphemistically called "incidents of discriminations", would raise serious equal protection problems. The concept of "incidents of discrimination" is an inscrutable new concept totally at odds with the teachings of *Brown* and its progeny—and with all previous cases in which the Department of Justice has appeared. Relief from discrimination requires conversion "to a unitary system". *Green, supra,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716. There are, of course, situations where only one school must be dealt with in a decree, as where school authorities segregate races in separate classes within a building. In such cases, the remedy would be to correct the wrong rather than to order the whole school student assignment system reconstituted. Such is not the case in the AISD.

■ E. *Transportation of students.* Bussing is not an end in itself but is one of the tools available to a district court in the process of remedying a segregated school system. Equal educational opportunity is constitutionally mandated; segregated education deprives the student of equal educational opportunity; segregated education must be ended. This is the teaching of *Brown I and II.*

Many school systems must use pairing, clustering, and remedial altering of attendance zones to integrate the school system. "Desegregation plans cannot be limited to the walk-in school." *Swann, supra,* 402 U.S. at 30, 91 S.Ct. at 1283. The bussing of students is often inherent in the use of these remedial tools. *See* Acree v. County Bd., 5 Cir. 1972, 458

F.2d 486; United States v. Greenwood Municipal Separate School District, 5 Cir. 1972, 460 F.2d 1205; Dandridge v. Jefferson Parish School Board, 5 Cir. 1972, 456 F.2d 552.

Bussing is not new to the South or to any other region of the country. Blacks have been bussed across a county to black schools; whites across a county to white schools. Private schools do not disdain bussing. In Swann v. Charlotte-Mecklenburg Board of Education, the Supreme Court noted that 18 million children, approximately 39 percent of the public school students, were bussed to their schools in 1969–70 "in all parts of the country". 402 U.S. at 29, 91 S.Ct. at 1282. The accepted use of extensive bussing in the past "has been an integral part of the public education system for years", 402 U.S. at 29, 91 S.Ct. at 1282, but objections to bussing "may have validity when the time or distance of travel is so great as to either risk the health of children or significantly impinge on the educational process", 402 U.S. at 30–31, 91 S.Ct. at 1283.

Whenever possible, we defer to the good judgment of the district judge. He knows the local situation better than we do. He may not, however, totally reject the use of bussing as a "permissible tool", "within the court's power to provide equitable relief". 402 U.S. at 30, 91 S.Ct. at 1283. There is no basis on this record for totally rejecting the use of bussing on the elementary school level (except to the limited extent it is used to transport pupils to the "learning research center.") On the secondary levels, there is no basis in the record for the district court's order requiring the bussing of two-thirds of the black students, a few Mexican-Americans, and *no* whites.[40]

---

40. Bus transportation has been an integral part of the public education system for years, and was perhaps the single most important factor in the transition from the one-room schoolhouse to the consolidated school. Eighteen million of the Nation's public school children, approximately 39%, were transported to their schools by bus in 1969–1970 in all parts of the country.
Swann v. Charlotte-Mecklenburg, *supra,* 402 U.S. at 29, 91 S.Ct. 1267, 1282, 28 L.Ed.2d 554. *See also* Brewer v. School Bd. of City of Norfolk, 4 Cir., 1972, 456 F.2d 943.

■ F. *Cost.* As the Supreme Court has said, "The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems." Swann v. Charlotte-Mecklenburg, *supra,* 402 U.S. at 28, 91 S.Ct. at 1282. Equal educational opportunity must be provided despite cost and inconvenience. See also Alexander v. Holmes County, 1969, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19; Carter v. West Feliciana Parish, 1969, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477.

## VII

### CONCLUSION

The plans and order below were prepared on the basis of the rulings and "guidelines" of the district court. Our opinion finds certain of the rulings of the district court to be in error. As a result we must remand the case to the district court for further proceedings consistent with this opinion. The district court should call for the immediate submission of new plans by the intervenors as well as by the original parties. In finding a constitutionally acceptable means for desegregation of the AISD from among the alternatives submitted by the parties and intervenors, the court should not hesitate to seek expert assistance.

Appropriate relief must be ordered before the commencement of the 1972–73 school years. "[T]he obligation of every school district is to terminate dual school systems *at once* and to operate now and hereafter only unitary schools". Alexander v. Holmes County, 1969, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19, 21. We do not advocate, nor do we approve in advance, any particular form of relief. *See* Swann v. Charlotte-Mecklenburg, *supra.* This Court will grant no stay of the district court order in regard to the new plans. Any appeals will be expedited to avoid disruption of the 1972–73 school year in the Austin Independent School District.

Reversed and remanded.

## APPENDIX A
### AUSTIN INDEPENDENT SCHOOL DISTRICT
### ETHNIC COMPOSITION OF STUDENTS & PROFESSIONAL STAFF
1970-71
(derived from Defendant's Exhibit No. 23)*

| | STUDENTS | | | | PROFESSIONAL STAFF | | | |
|---|---|---|---|---|---|---|---|---|
| School | Total | Black | Mexican American | White | Total | Black | Mexican American | White |
| **SENIOR HIGH SCHOOLS** | | | | | | | | |
| Anderson | 938 | 916 | 7 | 15 | 62 | 12 | | 50 |
| | | (98) | (.5) | (1.5) | | (19) | | (81) |
| Austin | 1378 | 203 | 260 | 915 | 83 | 8 | 1 | 74 |
| | | (15) | (19) | (66) | | 10 | (1) | (89) |
| Crockett | 2313 | 24 | 133 | 2156 | 115 | 9 | 3 | 103 |
| | | (1) | (6) | (93) | | (8) | (2) | (90) |
| Johnston | 1919 | 619 | 1195 | 105 | 101 | 8 | 15 | 78 |
| | | (32) | (62) | (6) | | (8) | (15) | (77) |
| Lanier | 2300 | 16 | 72 | 2212 | 114 | 10 | 3 | 101 |
| | | (1) | (3) | (96) | | (9) | (2) | (89) |
| McCallum | 1934 | 3 | 82 | 1849 | 94 | 8 | | 86 |
| | | | (4) | (96) | | (9) | | (91) |
| Reagan | 2605 | 285 | 52 | 2268 | 129 | 10 | 1 | 118 |
| | | (11) | (2) | (87) | | (8) | (1) | (91) |
| Travis | 1297 | 34 | 390 | 873 | 66 | 6 | | 60 |
| | | (3) | (30) | (67) | | (9) | | (91) |
| **SENIOR HIGH SCHOOLS TOTAL** | 14684 | 2100 | 2191 | 10393 | 764 | 71 | 23 | 670 |
| | | (14) | (15) | (71) | | (9) | (3) | (88) |
| **JUNIOR HIGH SCHOOLS** | | | | | | | | |
| Allan | 1039 | 437 | 557 | 45 | 58 | 6 | 1 | 51 |
| | | (42) | (54) | (4) | | (10) | (2) | (88) |
| Burnett | 1152 | 2 | 45 | 1105 | 59 | 6 | 1 | 52 |
| | | | (4) | (96) | | (10) | (2) | (88) |
| Fulmore | 974 | 27 | 310 | 637 | 48 | 5 | | 32 |
| | | (3) | (32) | (65) | | (10) | | (90) |
| Kealing | 739 | 721 | 17 | 1 | 46 | 11 | | 35 |
| | | (98) | (2) | | | (23) | | (77) |
| Lamar | 837 | 1 | 52 | 784 | 42 | 6 | | 36 |
| | | | (6) | (94) | | (14) | | (86) |
| Martin | 818 | 90 | 702 | 26 | 52 | 4 | 3 | 45 |
| | | (11) | (86) | (3) | | (8) | (6) | (86) |
| Murchison | 838 | | 4 | 834 | 43 | 4 | | 39 |
| | | | (1) | (99) | | (10) | | (90) |
| O. Henry | 862 | 44 | 86 | 732 | 47 | 4 | 1 | 42 |
| | | (5) | (10) | (85) | | (8) | (1) | (90) |
| Pearce | 1277 | 161 | 95 | 1021 | 60 | 7 | 2 | 51 |
| | | (13) | (7) | (80) | | (12) | (3) | (85) |
| Porter | 1303 | 16 | 109 | 1178 | 61 | 6 | 2 | 53 |
| | | (2) | (8) | (90) | | (10) | (3) | (87) |

| School | Total | STUDENTS | | | PROFESSIONAL STAFF | | | |
|---|---|---|---|---|---|---|---|---|
| | | Black | Mexican American | White | Total | Black | Mexican American | White |
| Webb | 940 | 71 | 118 | 751 | 49 | 4 | 1 | 44 |
| | | (7) | (13) | (80) | | (8) | (2) | (90) |
| **JUNIOR HIGH SCHOOLS TOTALS** | 10779 | 1570 | 2095 | 7114 | 565 | 63 | 11 | 491 |
| | | (15) | (19) | (66) | | (11) | (2) | (87) |
| **ELEMENTARY SCHOOLS** | | | | | | | | |
| Allison | 711 | 163 | 566 | 52 | 39 | 8 | 3 | 28 |
| | | (21) | (71) | (8) | | (21) | (8) | (71) |
| Andrews | 507 | 6 | 22 | 479 | 22 | 4 | | 18 |
| | | (1) | (4) | (95) | | (18) | | (82) |
| Baker | 190 | | 58 | 132 | 10 | 1 | | 9 |
| | | | (30) | (70) | | (10) | | (90) |
| Barrington | 484 | 12 | 39 | 433 | 21 | 5 | | 16 |
| | | (2) | (8) | (90) | | (24) | | (76) |
| Barton Hills | 357 | 2 | 10 | 345 | 15 | 2 | | 13 |
| | | | (3) | (97) | | (13) | | (87) |
| Becker | 816 | 58 | 556 | 202 | 41 | 11 | 2 | 28 |
| | | (7) | (68) | (25) | | (27) | (5) | (68) |
| Blackshear | 664 | 653 | 11 | | 35 | 9 | 1 | 25 |
| | | (98) | (2) | | | (25) | (3) | (72) |
| Blanton | 533 | 22 | 19 | 492 | 22 | 3 | | 19 |
| | | (4) | (4) | (92) | | (14) | | (86) |
| Brentwood | 856 | 3 | 85 | 768 | 36 | 8 | | 28 |
| | | | (10) | (90) | | (22) | | (78) |
| Brooke | 586 | 10 | 559 | 17 | 33 | 7 | 5 | 21 |
| | | (2) | (95) | (3) | | (21) | (15) | (64) |
| Brown | 563 | 37 | 86 | 440 | 27 | 5 | | 22 |
| | | (7) | (15) | (78) | | (19) | | (81) |
| BrykerWoods | 304 | 4 | 21 | 279 | 15 | 3 | | 12 |
| | | (1) | (7) | (92) | | (20) | | (80) |
| Campbell | 595 | 563 | 30 | 2 | 34 | 9 | | 25 |
| | | (95) | (5) | | | (26) | | (74) |
| Casis | 702 | 5 | 11 | 686 | 43 | 6 | | 37 |
| | | (.5) | (1.5) | (98) | | (14) | | (86) |
| Cunningham | 651 | 23 | 27 | 601 | 29 | 5 | | 24 |
| | | (4) | (4) | (92) | | (17) | | (83) |
| Dawson | 825 | 18 | 395 | 412 | 35 | 6 | | 29 |
| | | (2) | (48) | (50) | | (17) | | (83) |
| Dill | 141 | | 7 | 134 | 7 | 1 | | 6 |
| | | | (5) | (95) | | (14) | | (86) |
| Doss | 606 | | 6 | 600 | 24 | 3 | | 21 |
| | | | (1) | (99) | | (13) | | (87) |
| Govalle | 923 | 184 | 662 | 77 | 49 | 8 | 5 | 36 |
| | | (20) | (72) | (8) | | (16) | (10) | (74) |
| Gullett | 456 | 1 | 13 | 442 | 23 | 5 | | 18 |
| | | | (3) | (97) | | (22) | | (78) |
| Harris | 680 | 7 | 39 | 634 | 28 | 6 | | 22 |
| | | (1) | (6) | (93) | | (21) | | (79) |
| Highland Park | 623 | | 8 | 615 | 30 | 6 | | 24 |
| | | | (1) | (99) | | (20) | | (80) |

| School | Total | STUDENTS Black | STUDENTS Mexican American | STUDENTS White | Total | PROFESSIONAL STAFF Black | PROFESSIONAL STAFF Mexican American | PROFESSIONAL STAFF White |
|---|---|---|---|---|---|---|---|---|
| Hill | 522 | | 6 (1) | 516 (99) | 22 | 3 (14) | 1 (14) | 18 (82) |
| Joslin | 893 | 4 | 76 (9) | 813 (91) | 38 | 7 (18) | | 31 (82) |
| Lee | 225 | 9 (4) | 25 (11) | 191 (85) | 17 | 3 (18) | | 14 (82) |
| Manchaca | 176 | 7 (4) | 30 (17) | 139 (79) | 9 | 2 (22) | | 7 (78) |
| Maplewood | 522 | 302 (58) | 65 (12) | 155 (30) | 24 | 5 (21) | | 19 (79) |
| Mathews | 434 | 76 (17) | 150 (35) | 208 (48) | 26 | 4 (15) | | 22 (85) |
| Metz | 797 | 4 | 772 (97) | 21 (3) | 41 | 8 (20) | 5 (12) | 28 (68) |
| Norman | 329 | 325 (99) | 2 (.5) | 2 (.5) | 18 | 4 (22) | | 14 (78) |
| Oak Hill | 253 | | 10 (4) | 243 (96) | 10 | 1 (10) | | 9 (90) |
| Oak Springs | 457 | 445 (97) | 11 (3) | 1 | 30 | 9 (30) | 1 (3) | 20 (67) |
| Odom | 419 | 11 (3) | 27 (6) | 381 (91) | 17 | 2 (12) | | 15 (88) |
| Ortega | 617 | 363 (59) | 235 (38) | 19 (3) | 37 | 8 (22) | 3 (8) | 26 (70) |
| Palm | 755 | 3 | 724 (96) | 28 (4) | 40 | 10 (25) | 7 (17) | 23 (58) |
| Pease | 312 | 48 (15) | 47 (15) | 217 (70) | 16 | 3 (19) | 1 (6) | 12 (75) |
| Pecan Springs | 797 | 172 (22) | 28 (3) | 597 (75) | 35 | 6 (17) | | 29 (83) |
| Pillow | 433 | 2 | 12 (3) | 419 (97) | 20 | 3 (15) | | 17 (85) |
| Pleasant Hill | 293 | | 59 (20) | 234 (80) | 14 | 3 (21) | | 11 (79) |
| Read | 474 | 2 | 12 (3) | 460 (97) | 24 | 5 (21) | | 19 (79) |
| Reilly | 520 | 2 | 83 (16) | 435 (84) | 23 | 4 (17) | | 19 (83) |
| Ridgetop | 317 | 8 (2) | 100 (32) | 209 (66) | 17 | 3 (18) | | 14 (82) |
| Rosedale | 398 | 5 (1) | 82 (21) | 311 (78) | 22 | 5 (23) | | 17 (77) |
| Rosewood | 292 | 278 (95) | 12 (4) | 2 (1) | 19 | 6 (31) | | 13 (69) |
| St. Elmo | 827 | 10 (1) | 152 (18) | 665 (81) | 34 | 6 (18) | | 28 (82) |
| St. Johns | 162 | 153 (94) | 6 (4) | 3 (2) | 13 | 4 (31) | | 9 (69) |
| Sims | 576 | 563 (98) | 13 (2) | | 29 | 9 (31) | | 20 (69) |
| Summitt | 143 | | | 143 (100) | 8 | 1 (13) | | 7 (87) |

| School | Total | Black | Mexican American | White | Total | Black | Mexican American | White |
|---|---|---|---|---|---|---|---|---|
| | | | STUDENTS | | | | PROFESSIONAL STAFF | |
| Travis Hgts. | 967 | 10 | 162 | 795 | 41 | 8 | | 33 |
| | | (1) | (17) | (82) | | (20) | | (80) |
| Walnut Creek | 748 | | 44 | 704 | 29 | 5 | | 24 |
| | | | (6) | (94) | | (17) | | (83) |
| Winn | 450 | 3 | 22 | 425 | 19 | 3 | | 16 |
| | | (1) | (5) | (94) | | (16) | | (84) |
| Wooldridge | 512 | 6 | 33 | 473 | 24 | 4 | 2 | 18 |
| | | (2) | (6) | (92) | | (17) | (8) | (75) |
| Wooten | 887 | 6 | 50 | 831 | 45 | 8 | 2 | 35 |
| | | | (6) | (94) | | (18) | (4) | (78) |
| Zavala | 581 | 17 | 557 | 7 | 32 | 6 | 11 | 15 |
| | | (3) | (96) | (1) | | (19) | (34) | (47) |
| Zilker | 580 | 9 | 71 | 500 | 28 | 5 | | 23 |
| | | (2) | (12) | (86) | | (18) | | (82) |
| ELEMENTARY TOTALS | 29511 | 4614 | 6809 | 17989 | 1439 | 284 | 49 | 1166 |
| | | (16) | (23) | (61) | | (20) | (3) | (77) |
| GRAND TOTAL | 54974 | 8284 | 11194 | 35496 | 2768 | 418 | 83 | 2267 |
| | | (15) | (20) | (65) | | (15) | (3) | (82) |

*Figures in parentheses indicate percentages.

## APPENDIX B.

### Mexican-American Education in the Southwest

The United States Commission on Civil Rights has recently published two reports on Mexican-American education entitled Report I: "Ethnic Isolation of Mexican-Americans in the Public Schools of the Southwest", Mexican-American Education Study, April 1971 and Report II: "The Unfinished Education", Mexican-American Educational Series, October 1971. These authoritative and exhaustive reports, of which we take judicial notice, detail the educational status of the Mexican-American student. We deem it appropriate to restate some of the findings of the Commission's studies because they set the context in which this Court must consider the instant appeal.

There are approximately 1,400,000 Mexican-American students in the public schools of the southwestern states of Arizona, California, Colorado, New Mexico, and Texas.[41] There are approximately 500,000 Mexican-American students in Texas.[42] About 635,000 Mexican-American students, or 45 percent of this group's total enrollment in the Southwest, attend predominately Mexican-American schools. The Commission concluded that "[a]mong the five [southwestern] States, isolation is most pronounced in Texas . . . 16 percent of all schools in Texas are predominately Mexican-American and contain approximately 335,000 Mexican American pupils, or 66 percent of this group's enrollment in the State. Forty percent of all Mexican-American pupils are in schools that are nearly all Mexican American. More than one-fifth of the Mexican-American enrollment, are found in schools 95 to 100 percent Mexican American . . . " Report I, pp. 25–26.[43]

41. This figure constitutes 17.2 percent of the Mexican-American students in the United States, and 3.2 percent of all the students in the United States.

42. This figure constitutes 20.1 percent of all the students in Texas.

43. As to classroom teachers, the Commission reports:

A very small portion of the classroom teaching staff is Mexican American. Of approximately 325,000 teachers in the public schools of the Southwest, fewer

In order to assess the quality of Mexican-American education, the Commission studied (1) school holding power,[44] (2) reading achievement, (3) grade repetitions, (4) average, and (5) participation in extracurricular activities. First, as to school holding power, the Commission found:

The proportion of minority students who remain in school through the 12th grade is significantly lower than that of Anglo students, with Mexican American demonstrating the most severe rate of attrition. The Commission estimates that out of every 100 Mexican American youngsters who enter first grade in the survey area, only 60 graduate from high school; . . In contrast, 86 of every 100 Anglos remain in school and receive high school diplomas.

Report II, p. 42. Texas, according to the Commission "demonstrates the poorest overall record of any of the States in its ability to hold Mexican American students".

By the end of the eighth grade, Chicanos in the survey area have already lost 14 percent of their peers—almost as many as Anglos will lose by the 12th grade. Before the end of the 12th grade, nearly half, or 47 percent, of the Mexican American pupils will have left school. In 1968, there were approximately 290,000 Mexican Americans enrolled in grades 1 through 6 in Texas public schools. If present holding power rates estimated by the Commission continue, 140,000 of these young people will never receive a high school diploma.

than 12,000 [or 4 percent] are Mexican-American. [Of 105,000 teachers in Texas, 5,000, or approximately 5 percent are Mexican-American] . . .

In all States Mexican-Americans comprise substantially less of the teaching staff than they do of the student population. [In Texas, 5 percent of the teachers are Mexican-American, while 20 percent of the students are Mexican-American] . . .

In Texas there are three times as many Anglo students as Mexican-American students. However, the ratio of Anglo to Mexican-American teachers is 17 to 1. . . .

The pupil-teacher ratio within ethnic groups, that is, the number of pupils of each ethnic and racial group to each teacher of the same group, also graphically demonstrates the extent to which Mexican-Americans are under-represented among classroom teachers. In the Southwest as a whole, there are 120 Mexican-American pupils for every Mexican-American teacher. Among blacks the pupil-teacher ratio is 39 to 1, and among Anglos it is 20 to 1. [In Texas the Mexican-American ratio is 98 to 1] . . .

Mexican-American teachers are severely restricted in their school assignments. More than one-half [55 percent] of all Mexican-American teachers in the Southwest teach in predominately Mexican-American schools. (See Table 13.) One-third are in schools that are nearly

all Mexican-American. Furthermore, even in schools that are predominately Mexican-American, teachers of this ethnic background make up less than one-third of the total teaching staff. The low representation of Mexican-American teachers even in predominately Mexican-American schools, where they are concentrated, underscores the paucity of Mexican-Americans employed as classroom teachers in the Southwest.

Proportionately more Mexican-American teachers in Texas are in predominately Mexican-American schools than in any other State in the Southwest. Furthermore, only in Texas does the proportion of teachers in predominately Mexican-American schools substantially exceed that of pupils similarly situated. More than 80 percent of the approximately 5,000 Mexican-American teachers compared to two-thirds of the students are in predominately Mexican-American schools. More than 60 percent of the teachers and 40 percent of the students are in schools that are nearly all Mexican-American.

Report I, pp. 41–45

44. A basic measure of a school system's effectiveness is its ability to hold its students until they have completed the full course of study. In one sense, this is the single most important measure, for if a student has left school permanently, all efforts to enrich the quality of education are valueless to him.

Report II, p. 8.

Id. at 42. Second, as to reading achievement, the Commission concluded:

> Throughout the survey area, a disproportionately large number of Chicanos and other minority youngsters lack reading skills commensurate with age and grade level expectations. At the fourth, eighth, and 12th grades the proportion of Mexican American and black students reading below grade level is generally twice as large as the proportion of Anglos reading below grade level.

Id. at 42. In Texas, two-thirds of all Mexican-American 12th graders fail to reach grade level expectations in reading. Third, the Commission found that grade repetition among Mexican-Americans in the Southwest is "significantly higher than for Anglos".

> Some 16 percent of Mexican American students repeat the first grade as compared to 6 percent of the Anglos. Although the disparity between Mexican Americans and Anglo at the fourth grade is not as wide as in the first grade, Mexican American pupils are still twice as likely as Anglos to repeat this grade.

> . . . . . .

> In the Texas schools surveyed, 22 percent of Chicano pupils are retained in first grade.

Id. at 43. Fourth, the Commission surveyed pupils who were average for grade assignment and found that "Mexican-Americans in the survey area are as much as seven times as likely to be average as their Anglo peers". Finally, the Commission concluded:

> Involvement in extracurricular activities makes the school experience more meaningful and tends to enhance school holding power. The Commission found, however, that Mexican American students are underrepresented in extracurricular activities. This is true whether Mexican Americans constitute a majority or a minority of the student enrollment in a school.

## APPENDIX C

Ethnic Make-Up of New Schools Opened After 1954

| School | Opening Date | White | Black | Mexican-American | Total |
|---|---|---|---|---|---|
| Crockett | 1968 | 1763 | 10 | 110 | 1903 |
| Johnston | 1960 | 118 | 17 | 474 | 609 |
| Lanier | 1966 | 1251 | 6 | 38 | 1355 |
| Reagan | 1965 | 1488 | 68 | 48 | 1604 |

Senior High School

Junior High Schools

| School | Opening Date | White | Black | Mexican-American | Total |
|---|---|---|---|---|---|
| Allan | 1957 | 235 | - - | 720 | 955 |
| Burnett | 1961 | 1202 | - - | - - | 1202 |
| Lamar | 1955 | 806 | - - | 3 | 809 |
| Martin | 1967 | 34 | 189 | 743 | 966 |
| Murchison | 1967 | 770 | - - | 1 | 771 |
| Pearce | 1958 | 295 | - - | 3 | 298 |
| Porter | 1958 | 477 | - - | 22 | 499 |
| Webb | 1968 | 643 | 50 | 50 | 743 |

| School | Opening Date | White | Black | Mexican-American | Total |
|---|---|---|---|---|---|
| Elementary Schools | | | | | |
| Allison | 1955 | 127 | - - | 268 | 395 |
| Andrews | 1962 | 287 | - - | 9 | 296 |
| Barton Hill | 1964 | 225 | - - | 5 | 230 |
| Blanton | 1964 | 435 | - - | 4 | 439 |
| Brown | 1957 | 224 | - - | - - | 224 |
| Cunningham | 1962 | 155 | - - | 6 | 161 |
| Dill | 1955 | 165 | - - | - - | 165 |
| Cullett | 1956 | 323 | - - | - - | 323 |
| Harris | 1955 | 275 | - - | - - | 275 |
| Oak Springs | 1958 | - - | 426 | - - | 426 |
| Ortega | 1959 | 52 | - - | 266 | 318 |
| Pecan Springs | 1957 | 141 | - - | - - | 141 |
| Read | 1962 | 311 | - - | - - | 311 |
| St. Elmo | 1960 | 229 | - - | 34 | 263 |
| St. John | 1958 | - - | 229 | - - | 229 |
| Sims | 1956 | - - | 188 | - - | 188 |
| Walnut Creek | 1961 | 273 | - - | 18 | 291 |
| Wooten | 1955 | 258 | - - | 1 | 259 |

BELL, COLEMAN, AINSWORTH, GODBOLD, MORGAN, CLARK, INGRAHAM, and RONEY, Circuit Judges (specially concurring):

We concur in the result reached in the opinion prepared by Judge Wisdom to the extent of reversing and remanding the cause to the district court with direction that the dual school system and all discriminatory segregation against Mexican-American and black students be eliminated "at once" and that the Austin Independent School District "operate now and hereafter" only a unitary non-discriminatory school system. Alexander v. Holmes County Board of Education, 1969, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19.

In our view the remedy which the district court is required to formulate should be formulated within the entire context of the opinion in Swann v. Charlotte-Mecklenberg Board of Education, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed. 2d 554, and the companion case of Davis v. Board of School Commissioners of Mobile County, 1971, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577.

In giving effect to *Swann* we have in mind that the Supreme Court has placed the primary responsibility for desegregating public schools on the "informed judgment" of the district courts. It is necessary, however, in the appellate process, where many complicated school cases involving urban school systems are within the jurisdiction of this court, that some definitive direction be given with respect to the remedy which is to be fashioned in the district courts. This is particularly true where the school systems are organized as is Austin on a neighborhood basis with no transportation being furnished now except in the rural parts of the system.

There are two key passages in *Swann* which have to do with the remedy which is appropriate in school desegregation cases and we read these as being concomitant. The first is concerned with the power of the federal courts. The other pertains to the constitutional duty of the school authorities. With respect to power the Supreme Court said:

"[A] school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right. The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution.

In seeking to define even in broad and general terms how far this remedial power extends it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation. Remedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary. Judicial authority enters only when local authority defaults.

School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court. As with any equity case, the nature of the violation determines the scope of the remedy. 402 U.S. at 15–16, 91 S.Ct. at 1276.

The difference between the broad power of the school boards in making student assignments and the limitations on the power of the federal courts is explicit and at once apparent from *Swann*. In the federal courts, the nature of the violation determines the scope of the remedy.

Having defined the power of the district court in fashioning desegregation plans, the Supreme Court turned in *Swann* to the question of the constitutional duty of the school authorities and

884

the responsibility of the district courts. It was said:

". . . it should be clear that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law. The district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools. No *per se* rule can adequately embrace all the difficulties of reconciling the competing interests involved; but in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition. Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominately of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part." 402 U.S. at p. 26, 91 S.Ct. at p. 1281.

Given these principles, and the other definitive instructions contained in *Swann* and *Davis,* we have concluded that the district court should proceed to eliminate the dual school system as it has existed in Austin together with any and all discriminatory segregation which exists against Mexican-American and black students on the following basis:

(1) It is the prerogative and duty of those local officials having charge of the AISD to formulate and implement student assignment plans.

(2) Where a student assignment plan is found to be unconstitutional, as here, because of the existence of segregation which has been imposed by statute or by official act against blacks and an identifiable ethnic group (here the Mexican-American students), it is the duty of the school officials to forthwith formulate and implement such student assignment plan as will remedy the discrimination which has been found to exist. Where one race schools continue to exist, school authorities must show that such schools are not the result of present or past discrimination on their part. *Swann,* 402 U.S. at 26, 91 S.Ct. 1267, 28 L.Ed.2d 554.

(3) The power of the district court will depend first upon a finding of the proscribed discrimination in the school system. *Swann,* 402 U.S. at 16, 91 S.Ct. 1267, 28 L.Ed.2d 554. In determining the fact of discrimination *vel non,* whether imposed by statute or as a result of official action, the district court must identify the school or schools which are segregated as a result of such discrimination. This identification must be supported by findings of fact. The importance of such a determination will be seen in some populous school districts embracing large geographical areas. There may be segregated schools which are the result of unconstitutional statutes or of official action. There may be other one race schools which are the product of neutral, non-discriminatory forces.[1]

---

1. This approach of identification is implicit in the decision of this court in Dandridge v. Jefferson Parish School Board, 5 Cir., 1972, 456 F.2d 552. See language on p. 554 with respect to resegregated schools and shifting population trends, and the failure of the school board to show that the one race schools in question were non-

discriminatory. It is present in the result approved in Pate v. Dade County School Board, 5 Cir., 1971, 447 F.2d 150, cert. den. sub nom. Love v. Dade County School Board, 1972, 405 U.S. 1064, 92 S. Ct. 1493, 31 L.Ed.2d 794 (245,242 students in 218 schools; 69 all white schools, 15 predominantly black schools).

(4) The district court should give the school officials an opportunity to remedy the discrimination found to exist. Here, it is only in this court that the holding has been made that discriminatory segregation exists against Mexican-American students and that the proposed part-time integration plan of the school district is inadequate as a desegregation plan. Thus the local school officials should be afforded an opportunity to consider the matter anew. In the event the school officials abdicate this responsibility or fail to remedy the discrimination forthwith, the district court is empowered to and should proceed forthwith to remedy the discrimination.

(5) Usually in rural, and in some city school districts where the population is diffused, assignment on a strict neighborhood basis has been sufficient to eliminate discrimination in student assignments. It is apparent that this will not suffice in the AISD although it may suffice as to some schools. To the extent that it does not suffice, the district court will proceed to employ other methods of desegregation.

(6) The pairing or clustering of schools, the realignment of school assignment zones, and the relocation of portable school rooms will be methods of eliminating segregated schools. Pairing or clustering should be of schools in close proximity. The pairing or clustering of schools in close proximity and the realignment of school zones will result merely in an expansion of the neighborhood or community school concept. Such transportation problems as may arise will thereby be minimized. Another method of eliminating segregated schools with little increase in transportation is to restructure the assignment of students already being transported.

(7) If after utilizing the procedures outlined in (5) and (6) above, proscribed segregated schools still exist, the court must consider the pairing or clustering of schools in non-contiguous school zones. *Swann*, 402 U.S. 28, 91 S.Ct. 1267, 28 L.Ed.2d 554. No such pairing or clustering of non-contiguous school zones may be required until the court has exhausted every other possible remedy which would not involve increased student transportation. Whenever the court must exercise its power to pair or cluster schools located in non-contiguous zones, it must minimize student transportation requirements in such plan as is devised to pair or cluster schools located in non-contiguous zones.

The length and time of travel for students under any plan must be considered in light of the age of the children, and the risk to health and probable impingement on the educational process. *Swann*, 402 U.S. 30–31, 91 S.Ct. 1267, 28 L.Ed. 2d 554. The material consideration in assessing the probable effect on health and the educational process as to each particular child will be the time required for transportation as distinguished from distance. Under some plans children will be transported from their neighborhood school to the school of assignment rather than from their homes to the school of assignment. In such event, the time consumed in travel must include the time necessary to reach the neighborhood school or other point of embarkation.

In fashioning transportation plans the school board and district court must avoid invidious discrimination on the basis of race or national origin through the imposition of the burden of desegregation on one or both of the minority groups. Lee v. Macon County Board of Education, 5 Cir., 1971, 448 F.2d 746, 753–754; Mims v. Duval County School Board, 5 Cir., 1971, 447 F.2d 1330, 1331–1332.

(8) As the Supreme Court made clear in *Swann*, the requirement of ". . . any particular degree of racial balance or mixing . . ." as a matter of substantive constitutional right would be disapproved. 402 U.S. at 24, 91 S.Ct.

The identification approach is an obvious necessity, given the *Swann* limitation on federal judicial power. Id. 402 U.S. at 15–16, 91 S.Ct. 1267, 28 L.Ed.2d 554.

at 1280. Such racial balance as may result from the pairing or clustering or rezoning of schools is constitutionally permitted as "an interim corrective measure." *Swann,* 402 U.S. at 27, 91 S.Ct. 1267, 28 L.Ed.2d 554.[2]

An overall amelioration of any possible discrimination will tend to be accomplished by the use of the mandatory majority to minority transfer provision of *Swann,* supra, 402 U.S. at 36–37, 91 S.Ct. 1267, 28 L.Ed.2d 554, heretofore ordered by the district court. Such a provision will guarantee to both races an unfettered right to attend schools with members of an opposite race or identifiable ethnic group, and with transportation provided. The district court is directed to constitute a tri-ethnic committee in the school district to foster the use of the majority to minority transfer.[3]

We have previously outlined the requirements of desegregating school systems from the standpoint of faculty, staff, transportation, extracurricular activities, and facilities. Singleton v. Jackson Municipal Separate School District, 5 Cir., 1970, 419 F.2d 1211. See also Carter v. West Feliciana Parish School Board, 5 Cir., 1970, 432 F.2d 875, 878–879, explicating the *Singleton* rule to preserve and maintain a non-discriminatory merit system in faculty selection and retention. This left only the question of student assignment and we know from experience that this question has resolved itself principally into student assignment in urban school districts. Fidelity to the principles announced in *Swann* and *Davis* and the use of the approach outlined herein offers the best promise of promptly resolving the student assignment question posed

in an urban school district such as Austin.

WISDOM, Circuit Judge, with whom JOHN R. BROWN, Chief Judge, and GEWIN, GOLDBERG, DYER, and SIMPSON, Circuit Judges, join:

The remaining judges on the Court join in Judge Bell's special opinion concurring in the result but formulating the so-called remedy as if there were no record before the Court. Judges Wisdom, Coleman, and Simpson constituted the original panel in the instant case. Judges Gewin, Goldberg, and Dyer constituted the original panel in Cisneros v. Corpus Christi Independent School District, No. 71–2397, 5 Cir., 459 F.2d 13, a companion en banc case released simultaneously with the instant case.

## VIII. Discussion of Judge Bell's Special Opinion

The vice in the special opinion is its irrelevance. The opinion consists of abstract admonitions most of them old-hat to this Court, so general as to be unrelated to the facts and the issues in this case. The so-called steps to be taken to desegregate are the steps always taken in a school desegregation case.

The case took six days to try. There are numerous exhibits including important statistics showing the students and teachers by ethnic group in each school in Austin. A series of maps show population patterns over the years and site locations of all the schools. The case was well briefed by the parties, intervenors, and amici curiae. The record is as complete today as it will be a year from now when the same issues will be presented. The questions cry for settle-

---

2. In making certain that the school system is unitary and that the discrimination has been eliminated, we have required that specified reports be filed for three years and that the case not be dismissed thereafter without giving notice to plaintiff. Youngblood v. Board of Public Instruction of Bay County, Florida, 5 Cir., 1971, 448 F.2d 770; Wright v. Board of Public Instruction of Alachua County, Florida, 5 Cir., 1971, 445 F.2d 1397. See *Swann,*

402 U.S. at 31–32, 91 S.Ct. 1267, 28 L.Ed.2d 554 on the termination of federal court intervention in school cases.

3. The record in Ellis v. Board of Public Instruction of Orange County, Florida, No. 71–2696, now pending in this court, discloses that in the 1970–71 school term there were 2,095 transfers of black students under the majority to minority transfer provision out of a total of 15,747 black students in the system.

ment. Instead of the judicial resolution of controverted issues squarely before the Court, the majority opinion produces generalized statements that would be innocuous except that the looseness of their language opens the way for recalcitrant school boards to evade the Supreme Court's mandate in *Swann:*

"The district judge or school authorities should make every possible effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools."

The important issue in this case, as in *Cisneros,* is whether Mexican-Americans, who never were subjected to statutory segregation, are entitled to the same benefits of school desegregation as blacks or whites. The district judge in this case recognized that in Austin Mexican-Americans are an identifiable ethnic minority, but because he found no de jure segregation afforded them no relief. The Court is under the inescapable duty to face this issue: indeed, the Court must say that the district judge was clearly erroneous in applying an improper standard. In the opinion on the merits we demonstrated that "de jure" segregation is not limited to statutory segregation; the actions of the school board constituted "state action" within the meaning of the Fourteenth Amendment. *Cisneros* is in accord and boldly discards the de facto-de jure dichotomy. I concur in the substantive holdings in *Cisneros,* but I prefer to apply the term "state action" to the Board's acts and to regard the Board's discrimination against Mexican-Americans as de jure discrimination.

The special opinion does not meet this issue or deal with the merits in any way. As Judge Godbold correctly noted in his opinion, "The validity of the de facto-de jure dichotomy remains unanswered" in Judge Bell's opinion for the majority. Judge Bell does employ the words "official action" (not a term of art, as is "state action"), but without identifying the acts, in spite of a record that unquestionably shows the state action that was

discriminatory. For example, the majority does not discuss the proven fact that the AISD promoted segregation by locating black schools in black areas, Mexican-American schools in Mexican-American areas and assigning students and teachers to those schools on the basis of their race. To confuse the AISD and district court further the opinion takes great pains to state that there may be "one race schools which are the product of neutral, non-discriminatory forces".

The special opinion speaks of formulating the remedy "within the entire context" of *Swann,* but conspicuously absent is any reference to *Swann's* emphasis on the *affirmative* constitutional duty imposed on school officials. The affirmative duty doctrine, on which *Jefferson* rests, was firmly expressed by the Supreme Court in Green v. New Kent County School Board, 1968, 391 U.S. 430, 437, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716:

"School boards * * * [are] clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch".

Of course new plans must be submitted. But this Court should let the litigants and the district court know in what respects the present plan was defective by fulfilling the judicial duty of a reviewing Court to decide the justiciable questions put to it. This Court should let the AISD know now that on the record before us it was clearly erroneous for the district judge to hold that there was no de jure discrimination against Mexican-Americans in Austin, Texas.

This Court should decide now, not a year from now, that the court-approved plan for Austin school desegregation was constitutionally defective for the following reasons. (1) The plan put almost the entire burden of bussing on the blacks by closing black schools, and bussing two-thirds of all blacks in the school system, a few Mexican-Americans, and *no* whites. The plan contemplates assigning Mexi-

can-Americans to black schools or to predominantly Mexican-American schools but only a handful to Anglo schools. (2) Unlike any school plan this Court has approved, the Austin plan excluded desegregation of the elementary grades. Part-time desegregation does not comply with the constitutional command that the school system be fully converted to a unitary system. (3) The plan required, as the evidence proved, that two black schools should be closed for racial reasons—the fear of a white flight to the suburbs, if the schools should be desegregated. Each of these schools, Anderson and Kealing, was within the desirable junior high school range in capacity and acreage. (4) The plan contains no provision for requiring the school board to increase the number of Mexican-American teachers from its present three percent to a percentage more closely representative of the student population of Mexican-Americans of twenty percent. Such a provision is a logical extension of the requirement in a black-white system that in each school the faculty represent the ratio of black teachers to white teachers in the entire school system. In a black-white school system the teacher ratio closely approximates the student ratio.

The most destructive feature of Judge Bell's opinion is its ambiguous treatment, in subparagraph 3, of the Justice Department's about-face. Ever since *Brown* the Department has taken the position that school segregation is system-wide in nature and must be remedied by system-wide measures. Infection at one school infects all schools. To take the most simple example, in a two school system, all blacks at one school means all or almost all whites at the other. Up to now, neither the Department of Justice nor this Court has ever spoken of "incidents" or "pockets of discrimination" or required the district court, as Judge Bell puts it "to identify the school or schools which are segregated"; or stated that the "identification must be supported by findings of fact"; or as-

serted that some "one race schools . . . are the product of neutral, non-discriminatory forces". These are blatant euphemisms to avoid desegregating the *system*, preserving the whiteness of certain schools.

Nowhere in any opinion of this Court has there ever been any requirement of racial balance except as to the black-white teacher ratio. But when a school *system* is converted to a unitary *system* by pairing and clustering of schools, or other methods, it is a fact of life that such conversion cannot be accomplished without bussing. I sincerely hope that I have not misrepresented Judge Bell's position. The point is that the Department of Justice dreamed up a new defense for school boards in desegregation cases, that is, that there need not be system-wide desegregation of Mexican-Americans. And if this argument applies to Mexican-Americans, will it not in the future also apply to blacks? In short, the argument undermines all of the desegregation cases since *Brown* by eroding the principle that the dual system must go, lock, stock, and barrel. I may have misread the majority opinion. The opinion may have ignored this issue, in spite of the stress placed on it in briefs and oral arguments of the Assistant Attorney General. But I read subparagraph 3 as an invitation, an ambiguous invitation, but an invitation to school boards to seek refuge in demographic patterns with respect to all-white or predominantly white schools.

The majority opinion may have value to first year law students—except for the defects I have pointed out—as an exposition of the judicial process in school desegregation cases generally. It is also an example of how a reviewing court can pass the buck, give the school board a delay, and confuse the district court on remand. It is said that it marks a turning point for this Court. It is the first backward step for a Court that has labored mightily to follow faithfully the mandates of the Supreme Court and of Congress in the field of civil rights.

I respectfully dissent from the majority opinion relating to the so-called remedy.

GEWIN, Circuit Judge, with whom JOHN R. BROWN, Chief Judge, and WISDOM, GOLDBERG and SIMPSON, Circuit Judges, join:

For the reasons stated in my opinion concurring in part and dissenting in part in Cisneros v. Corpus Christi Independent School District, No. 71–2397, 5 Cir. 459 F.2d 13, I dissent from the majority opinion outlining a remedy in this case.

GODBOLD, Circuit Judge, with whom BELL, COLEMAN, MORGAN, AINS-WORTH, CLARK and INGRAHAM, Circuit Judges, join, files the following special opinion:

The highest standards of judicial administration demand that pending further action by the Supreme Court of the United States this appeal be held in abeyance without reaching the merits. The wisdom of such a course is demonstrated by the divisions among the members of our court in this case. Of the fourteen judges participating, seven are of the view that at this time our decision should be to make no decision on the merits. The court proceeds to a merits decision, not because a majority approve of that action but on the parliamentary ground that since the proposed decision of not reaching the merits at this time commands the vote of only one half of those participating, consideration of the merits is required. On the merits a majority agree only on the result and a statement of remedy.

With full awareness of our responsibilities as judicial officers of the United States, we have attempted to the best of our abilities to implement Brown v. Board of Education.[1] Since 1954 this

Circuit has had before it more than 500 appeals in school cases. At no time have we evaded the task.

Our country is sharply divided over aspects of school desegregation, particularly the assignment of pupils to schools and the consequent necessity in some instances of transporting students who otherwise would not be transported. The problem of school segregation is national in scope. The efforts to disestablish segregated schools have had repercussions far beyond the original confines of the problem and into broader issues such as flight from urban areas, the decay of our cities, and the ability of our governmental structures to survive the overall economic consequences.

The validity of the de facto-de jure dichotomy, and its interplay with the necessity of state action, remain unanswered. Until the Supreme Court provides a definitive answer we do not know what we should do about segregation springing from causes other than affirmative state action. Among both judges and commentators there are numerous opinions, and shadings of opinion, as to the meaning of *Swann*.[2]

This court has committed itself to giving deference to desegregation plans and proposals emanating from agencies of the executive branch of the government that possess expertise in the field, and we have required district judges and school officials to give similar deference. But we have seen those agencies become divided within themselves, their policies and recommendations changeable and changing from case to case and even in the same case.

In short, in the present state of the law, it is virtually impossible for this court to render decisions in complex student assignment cases with confidence in the correctness of what we do. In like manner, in many situations school

1. Brown v. Bd. of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) [Brown I]; Brown v. Bd. of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) [Brown II].

2. Swann v. Charlotte-Mecklenburg Bd. of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

boards, their attorneys, and district judges are without rudder or compass. Yet the remedies which we judges are asked to provide in difficult pupil assignment cases will have massive impact upon the lives, the families, and the future of millions of people, and tremendous economic and sociological impact upon their communities. Some of those consequences will be wholly irreversible.

Therefore, until the Supreme Court can go to the heart of this grave national issue and give us the guidance essential to the performance of our duties, we should hold in abeyance all those pupil assignment cases which cannot be solved by well recognized tools whose validity is beyond question, such as pairing contiguous schools, majority to minority transfers, and minimal additional transportation of students. Some of the issues presented in this appeal and in numerous other cases pending before us are common to Keyes v. Denver School District No. 1, 445 F.2d 990 (10th Cir., 1971), cert. granted, 404 U.S. 1036, 92 S.Ct. 707, 30 L.Ed.2d 728 (1972), which is on the 1972–73 docket of the Supreme Court, having been carried over from the 1971–72 term, and presumably will be argued in the fall of this year. It is routine procedure for us to await Supreme Court action in such circumstances—each year we do so in numerous cases. The judicious staying of our hand while awaiting further instructions is the same approach taken by this court over a period of months while awaiting the decision of the Supreme Court in *Swann*. Pending Supreme Court decision on the death penalty, the same approach was taken country-wide by combined executive and judicial action in order that condemned prisoners not be executed. The question in school cases of our powers and duties with respect to student assignments is no less deserving of similar handling.

Our view is not the consequence of action either taken or proposed by the executive and legislative branches of our government. Stated simply, as judicial officers we need additional judicial guidance before we undertake measures which will so deeply and so irreversibly affect the fabric of our country and its people and its communities. If the Supreme Court considers it inappropriate to articulate further guiding principles, we can again take up the task and do the best we can with it. It is not flight from duty but rather performance of it to recognize that we need guidance and to say that we will withhold action to see if more certain legal standards become available to us.

We, therefore, dissent from consideration of the merits at this time. Directed as we are to consider the merits, we concur in the special concurring opinion of Judge Bell. As we understand it, that opinion concurs in only the result of reversing and remanding the case to the District Court.

JOHN R. BROWN, Chief Judge, with whom WISDOM, GEWIN, GOLDBERG, DYER and SIMPSON, Circuit Judges, join:

This is intended solely as a response to the opinion of Judge Godbold that we should postpone action until (i) the Supreme Court acts in *Keyes* with the hope that (ii) when it speaks we will be informed on what the law as then declared tells us what we might or must do. Were we to do so we would, in my view, abdicate our function. Although these are inescapably hard words, they are hard by the nature of the action which we must take. They are not hard—they must not be so understood—in the sense that I think my dissenting Brothers are less sensitive to their duties or that they are shirking a hard decision. To the contrary, this Court and each of its members faces up to hard decisions. We have made them. By our judgments today we still do. Indeed, the dissenters perform their sense of obligation by the genuine conviction that we should wait.

But waiting is not the privilege of a Federal Judge. He must act in the face of the day's challenge to constitutional denial. Indeed, the very Court to whom the dissenters look for guidance has in no uncertain words made it plain to this Court—one whose record in school cases exceeds all in volume and, hopefully, history will recognize with comparative quality—that we should get on with our job—job being the street's description of duty.

In response to a modest request delivered safehand by air courier by the Secretary of HEW to the Chief Judge at his home for a 60-day extension of the effective date of a plan for some 20 Mississippi school districts, the Supreme. Court summarily reversed this Court. Alexander v. Holmes County Board of Education, 1969, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19.

When we met in November 1969 to hear a dozen school cases en banc, this decision was fresh on our minds. On en banc consideration of those cases and in recognition of the late time in the school year, we again thought that there was a reasonable basis for a postponement of pupil assignment until the next September at the commencement of the next school year. With the ink scarcely dry on our order, we were told again in positive terms to get on with the business—the business we had tried so hard to prosecute since 1957! Carter v. West Feliciana Parish School Board, 1970, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477. Not a Judge on this Court disparaged either summary reversal. Indeed, the reversals were consistent with everything we had done in the long march from Mansfield.[1]

These decisions were sharp, peremptory reminders of our duty to decide— not just rubber stamp after getting the word from Mount Olympus.

Now we must heed this call again. A realist knows that we will not get the answers if we wait. With all deference, *Swann* is proof of that. More important, to delay means that identifiable children —now Mexican-Americans, not primarily Blacks—will leave the last year of their public education without ever experiencing a single year of education free of racial/ethnic discrimination.

We cannot do much for these twelfth graders (or dropouts in the lower echelons), but what we can do we must do. And we must do it now. Talk about waiting for *Keyes* is to forget the victims of September 1972—June 1973, if not those of September 1973—June 1974 whose plight will then be another rehash of the Supreme Court's *Keyes* decision begun in the Texas Federal District Court and wending its way to this Court.

Surely, after the 19 years (1954–1973) since *Brown* there must be a better answer than this.

CLARK, Circuit Judge, with whom COLEMAN, Circuit Judge, joins:

Judge Godbold's reasoning not only persuades me that this court is in error in refusing to stay its hand now, but also compels me to take the view that the novel issues which this case presents should be immediately certified to the Supreme Court of the United States under the authority of 28 U.S.C.A. § 1254 (3).

---

1. Jackson v. Rawden, 5 Cir., 1956, 235 F. 2d 93, cert. denied, 352 U.S. 925, 77 S.Ct. 221, 1 L.Ed.2d 160; United States v.

Flagler County School District, 5 Cir., 1972, 457 F.2d 1402.